BROWN-FORMAN CORPORATION (A DELAWARE CORPORATION), SUCCESSOR BY MERGER TO BROWN-FORMAN CORPORATION (A TENNESSEE CORPORATION), SUCCESSOR IN INTEREST TO SOUTHERN COMFORT CORPORATION (A DELAWARE CORPORATION), PETITIONER[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27494-87.        Filed June 25, 1990.

---

[1]The deficiencies relate to the tax liability of Southern Comfort Corp. for the years in issue. During those years, Southern Comfort Corp. filed its returns with the Internal Revenue Service Center in Kansas City, Missouri. Brown-Forman Corp., a Delaware corporation (hereafter, petitioner), is the proper petitioner in the instant case by reason of being the successor by merger to Brown-Forman Corp., a Tennessee corporation, which in turn was the transferee of the assets of Southern Comfort Corp.

*Walter D. Haynes,* for the petitioner.
*Aubrey C. Brown,* for the respondent.

WELLS, *Judge:* Respondent determined deficiencies in Federal income tax as follows:

| TYE | Amount |
| --- | --- |
| Apr. 30, 1981 | $1,668,237 |
| Apr. 30, 1983 | 319,381 |

After concessions by petitioner, the issues for consideration herein are as follows: (1) Whether "gross receipts" from domestic sales, for purposes of the "overall profit percentage limitation" (OPPL) imposed by section 1.994-2(b)(3), Income Tax Regs., may be reduced to reflect the seller's payment of the Federal excise tax on distilled spirits, (2) whether "gross receipts," for purposes of the OPPL, includes amounts attributable to the extinguishment of the excise tax lien on distilled spirits which are exported, (3) whether section 1.994-2(b)(3), Income Tax Regs., imposing the OPPL, is valid, and (4) whether the aggregation rule of section 1.994-2(c)(2)(ii), Income Tax Regs., may be applied unilaterally or requires conforming treatment from "related suppliers" with which aggregation is desired.

### FINDINGS OF FACT

Many of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated herein by this reference. Petitioner had a principal place of

business in Louisville, Kentucky, at the time it filed the petition in the instant case.

During the taxable years in issue, Brown-Forman Distillers Corp. owned all of the outstanding stock of its two subsidiaries, the Southern Comfort Corp. (hereafter Southern Comfort) and Jack Daniel Distillery Lem Motlow Prop., Inc. (hereafter Jack Daniel). Jack Daniel in turn owned all of the outstanding common stock of its subsidiary, the Jack Daniel International Co. (hereafter JDI), a domestic international sales corporation under section 992.

Southern Comfort during the years in issue engaged in the production and sale of Southern Comfort liqueur. Southern Comfort sold the liqueur in the United States and for export to foreign markets. On December 1, 1979, Southern Comfort entered into an agreement with JDI appointing JDI as its commission agent for its export sales. Such agreement provided that the commission payable by Southern Comfort to JDI would be "the maximum permissible under Section 994 of the Code." Jack Daniel during the years in issue engaged in the production and sale of "Jack Daniel's Tennessee Whiskey." On December 1, 1979, Jack Daniel entered into an agreement with JDI identical to the one entered into between Southern Comfort and JDI.

Section 5001(a)(1)[2] imposes an excise tax on "all distilled spirits produced in or imported into the United States," at the rate of $10.50 on each proof gallon.[3] Section 5001(b) provides that "the tax shall attach to distilled spirits as soon as this substance is in existence as such," and section 5004(a)(1) provides the general rule that "the tax imposed by section 5001(a)(1) shall be a first lien on the distilled spirits from the time the spirits are in existence as such until the tax is paid." Under section 5171, distilling operations can be conducted only on "bonded premises," and section 5173(a)(1) requires the furnishing of a bond before operations at a distilled spirits plant may commence. Southern Comfort's alcoholic beverage production process

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]A"proof gallon" is equivalent to 1 gallon of spirits at 100 proof. One gallon of 150 proof spirits would equal 1.5 "proof gallons."

was, during the years in issue, a "distilled spirits operation" performed on "bonded premises."

Under section 5005(b), the persons liable for the excise tax on domestically produced distilled spirits are, generally, all distillers or proprietors of distilling apparatus. Southern Comfort and Jack Daniel fell within such category. Although under section 5004 the excise tax represents a lien on distilled spirits from the time they come into existence, the actual amount of tax is generally not "determined" or made payable until a later time. More specifically, under section 5006, the excise tax on distilled spirits is generally determined at the time that the spirits are withdrawn from "bonded premises." Such tax determination is accomplished in part through the use of gauging instruments which ascertain the proof of the spirits. Secs. 5006(a)(1), 5204; 27 C.F.R. secs. 19.25, 19.91-19.93 (1989).

The lien imposed by section 5004 terminates by operation of law (1) at the time that the spirits are withdrawn from bonded premises and the tax "determined," (2) upon export of the spirits or deposit of the spirits in a customs bonded warehouse, or (3) under certain other circumstances including the withdrawal of distilled spirits from bond for certain exempt uses (such as laboratory use or use in the manufacture of certain nonbeverage products). Section 5008 provides that, upon presentation of satisfactory proof, no tax will be imposed with respect to distilled spirits which are lost or destroyed while in bonded premises, subject to various exceptions concerning negligent, intentional, or collusive (i.e., fraudulent) loss of the spirits.

Southern Comfort manufactured its liqueur by purchasing "grain neutral spirits" from unrelated distillers and then mixing the neutral spirits with a flavoring concentrate to make the final product. Under section 5005, the unrelated distillers and Southern Comfort were jointly and severally liable for payment of the excise tax. Sections 5005(c)(2) and 5212, however, provide for a procedure under which the liability of the unrelated distillers could be relieved and the spirits transferred to Southern Comfort's facilities without immediate payment of the excise tax. In order to take advantage of such procedure (presumably to lessen the price of the neutral spirits), Southern Comfort posted a "unit

bond" in the sum of $1,300,000 with the Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms.

The bond posted by Southern Comfort also allowed Southern Comfort to withdraw cased bottles of liqueur from its "bonded premises" and ship them to customers after "determination" of the tax but before payment. See sec. 5173 and 27 C.F.R. sec. 19.515(b) (1989). The date of withdrawal fixed the date by which the tax was required to be paid, and returns were required to be filed reporting the amounts of spirits withdrawn from bonded premises in each semimonthly period. See 27 C.F.R. secs. 19.522-19.523 (1989). The bond posted by Southern Comfort could be collected upon by the Government if Southern Comfort defaulted in its return filing and tax payment obligations. Sec. 5173(e) and (g). The excise tax was payable during 1981 within 10 days after the last day of the succeeding semimonthly "withdrawal" period, and, starting in 1982, by the end of the second succeeding semimonthly period. Sec. 5061(d). Such due date was unrelated to the time of sale, if any, of liqueur to Southern Comfort's customers.

The excise tax on distilled spirits is not imposed with respect to exported distilled spirits. See sec. 5005(e)(2) (liability terminates at time of export). As noted above, the lien imposed by section 5004 terminates when the distilled spirits are exported or deposited in a customs bonded warehouse, and section 5214(a)(9) allows the distilled spirits to be transferred without payment of tax to a customs bonded warehouse for storage pending exportation. Thus, during the years in issue, Southern Comfort was not required to remit any excise tax to the Government with respect to its exported liqueur. Under the excise tax statute as in effect prior to January 1, 1980, however, Southern Comfort was required to pay the tax on *all* liqueur transferred out of its warehouse to its bottling facilities and then obtain a "drawback" of the tax allocable to the exported items. Such procedure arose from the fact that, prior to January 1, 1980, bottling facilities were not considered part of a distiller's "bonded premises," and there was no provision in effect permitting the withdrawal of distilled spirits for bottling pending export without payment of tax.

In its accounting records, Southern Comfort recorded as "sales" the total sales proceeds received from customers (not reduced by the excise tax on distilled spirits). Southern Comfort's internal financial statements classified the excise tax as a component of "total production costs," which costs made up part of the "cost of goods sold." For the fiscal year ended April 30, 1981, the excise tax is shown on such financial statements as representing 63.9 percent of total production costs; for the fiscal year ended April 30, 1982, the excise tax is listed as representing 62.61 percent of total production costs.[4] On its Federal income tax returns (Form 1120) for the years in issue, Southern Comfort included in gross receipts (on line 1) the total amount received from its customers for the purchase of the liqueur and deducted the excise tax on distilled spirits as an expense (on line 17).

In collecting sales proceeds from its customers, Southern Comfort did not separately state distilled spirits excise taxes on its invoices, and did not maintain a segregated bank account for payment of the excise tax. The tax was not based upon sales price to customers, and the customers were not liable for the tax. Southern Comfort generally paid the excise tax with respect to a particular shipment of distilled spirits prior to the time that the account receivable with respect to such shipment was paid by the customer.[5] During the years in issue, Brown-Forman Distillers Corp. made substantial efforts in opposition to a proposed increase in the Federal excise tax on distilled spirits.[6]

OPINION

*Background*

As part of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, Congress created the Domestic International Sales Corporation (DISC) as a tax incentive designed to stimulate exports and to remove a tax disadvantage faced

---

[4]The large amount of the excise tax paid by Southern Comfort mandated its disclosure within the sales figures included in Southern Comfort's annual reports filed with the SEC.

[5]We agree with respondent that the timing of Southern Comfort's payment of the excise tax is relevant to the excise tax issue in the instant case. See *Lucky Lager Brewing Co. v. Commissioner*, 246 F.2d 621, 623 (9th Cir. 1957), affg. 26 T.C. 836 (1956).

[6]Petitioner's relevancy objections to the stipulated exhibits indicating Brown-Forman Distillers Corp.'s opposition to such excise tax increases are overruled, as we find the existence of such opposition relevant to the excise tax issue herein.

by U.S. firms engaged in exporting through domestic corporations, instead of through foreign manufacturing subsidiaries. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 502, 529; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 565, 609. The DISC provisions are contained in sections 991 through 997. A qualifying DISC provides a deferral mechanism for a portion of the Federal income tax on income derived from exports. The DISC itself is not taxed. Sec. 991. Instead, the DISC's shareholders are taxed currently on a portion of the DISC's earnings and profits, the other portion enjoying tax deferral until withdrawn from the DISC or until the corporation ceases to qualify as a DISC. *CWT Farms, Inc. v. Commissioner*, 755 F.2d 790, 794 (11th Cir. 1985), affg. 79 T.C. 86 (1982). See also *Dresser Industries v. Commissioner*, 92 T.C. 1276, 1280 (1989), on appeal (5th Cir., October 23, 1989); *Bentley Laboratories, Inc. v. Commissioner*, 77 T.C. 152, 162-163 (1981); Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 at 1037-1041 (J. Comm. Print 1984).

In order to qualify as a DISC, at least 95 percent of a corporation's gross receipts must be export related ("qualified export receipts"), and at least 95 percent of the corporation's assets must be export related ("qualified export assets"). Secs. 992(a)(1), 993(a) through (c), S. Rept. 92-437, *supra* at 613-614. An entity which meets the requirements for qualification as a DISC is treated as a separate corporation for Federal tax purposes even though such entity would not otherwise be treated as a corporation for Federal tax purposes. Sec. 1.992-1(a), Income Tax Regs. Thus a DISC may function solely "as an accounting device for measuring the amount of export earnings subject to tax deferral." *Anchor Hocking Corp. v. United States*, 11 Cl. Ct. 173, 174 (1986). JDI was a "shell" corporation entitled to be treated as a separate corporation under section 1.992-1(a), Income Tax Regs.

A DISC may operate on a "buy-sell" basis (by taking title to the property to be exported) and/or on a commission basis (under which it functions as a commission agent for export sales). During the years in issue, JDI operated on a

commission basis with respect to products exported by Southern Comfort and Jack Daniel.

Section 994(a) sets forth three intercompany pricing methods that apply in determining the amount of income a DISC may earn when it purchases property from a related company and resells the property for export.[7] The methods contained in section 994(a) serve to allocate the profit from an export sale between the DISC and its "related supplier." *Bentley Laboratories, Inc. v. Commissioner, supra* at 163.

The first two intercompany pricing methods contained in section 994(a) are safe harbors which permit a DISC to earn the greater of 4 percent of "qualified export receipts" on the sale of export property or 50 percent of the "combined taxable income" attributable to such receipts plus (in either case) 10 percent of the DISC's "export promotion expenses" (sec. 994(c)). The legislative history of section 994 indicates that Congress intended those safe harbor rules "to avoid the complexities of the present pricing rules [of section 482]." S. Rept. 92-437, *supra* at 618. Under section 994(a)(3), however, the rules of section 482 may be used by the taxpayer to allocate an arm's-length profit to the DISC if such rules would allow a greater allocation of profit to the DISC than either safe harbor. S. Rept. 92-437, *supra.* The choice of an intercompany pricing method is made either on a transaction-by-transaction basis, or, at the annual choice of the taxpayer, on the basis of groups made up of products or product lines. Sec. 1.994-1(c)(7), Income Tax Regs. Southern Comfort liqueur and Jack Daniel's Tennessee Whiskey fell within the same "product line" for such purpose.

---

[7]SEC. 994. INTER-COMPANY PRICING RULES.

(a) IN GENERAL.—In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—

(1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts,

(2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as a result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or

(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

Although the three intercompany pricing methods contained in section 994(a) literally apply only to DISCs operating on a "buy-sell" basis, *Dresser Industries v. Commissioner, supra* at 1290, section 994(b)(1) provides that rules consistent with those set forth in section 994(a) shall be prescribed by regulation for DISC's operating on a commission basis. See sec. 1.994-1(d)(2), Income Tax Regs. The regulations promulgated under section 994(b)(1) permit a commission DISC to earn the same amount of income as a DISC operating on a buy-sell basis. Sec. 1.994-1(d)(2)(i), Income Tax Regs.[8] The instant case involves the "50 percent combined taxable income" method of section 994(a)(2) as applied to a commission DISC, and arises out of respondent's disallowance of deductions claimed by Southern Comfort for commissions paid to JDI.

The term "combined taxable income," for purposes of section 994(a)(2), is not defined in the DISC provisions. The legislative history of section 994, however, indicates that "combined taxable income," in the case of a buy-sell DISC, is merely the DISC's receipts on the sale of export property less the related supplier's cost of goods sold for the property and the applicable other expenses of the parent company and the DISC. S. Rept. 92-437, *supra* at 618-619 n. 6. In the case of a commission DISC, the "gross income" of the DISC is deemed to be the gross receipts derived by the *principal* from the sale, lease, or rental of the property *on which the commissions arose.* Sec. 993(f) and sec. 1.993-6, Income Tax Regs. Thus, "combined taxable income," in the case of a commission DISC, is determined *without regard to commission income of the DISC,* and the amount of commissions which the DISC may earn on a sale is "backed into" under section 994(a)(2) and the applicable regulations.

Combined taxable income generally is computed under a "full costing" method; that is, by subtracting from gross receipts all expenses, losses, and other deductions definitely related to such receipts plus a ratable part of any other expenses, losses, and other deductions not definitely related to a class of gross income (consistent with the rules of

[8]Under sec. 1.994-1(d)(2), Income Tax Regs., "in essence, a fictional sale is deemed to have occurred between the related supplier and such DISC." *Dresser Industries v. Commissioner,* 92 T.C. 1276, 1281 (1989), on appeal (5th Cir., Oct. 23, 1989).

section 1.861-8, Income Tax Regs.). Sec. 1.994-1(c)(6)(iii), Income Tax Regs. "Cost of goods sold," under the full costing method, is generally determined in accordance with section 1.61-3, Income Tax Regs., and sections 471 and 472 (with respect to inventories). Sec. 1.994-1(c)(6)(ii), Income Tax Regs.

As an alternative to the full costing method for determining combined taxable income under section 994(a)(2), section 994(b)(2) authorizes the Secretary to issue special rules governing the allocation of expenditures "in those cases where a DISC is seeking to establish or maintain a market for export property." The Senate Finance Committee Report issued in connection with the enactment of section 994(b)(2) states:

> Where a DISC is attempting to establish a market abroad, or seeking to maintain a market abroad, for exports, the Secretary of the Treasury may prescribe by regulations special rules governing the allocation of expenses incurred on the sale of the export property for purposes of determining the combined taxable income of the related person and the DISC. It is expected that in the appropriate cases the regulations will allow, for purposes of applying the second pricing rule, the combined taxable income on the sale of export property to reflect a profit equal to that which the DISC and a related party would earn if they took into account only the marginal costs of producing the property. * * * [S. Rept. 92-437 (1971), 1972-1 C.B. 559, 619.]

Section 1.994-2, Income Tax Regs., contains the "marginal costing rules" authorized by section 994(b)(2) and its legislative history. Marginal costing, as a general proposition, permits an increased allocation of commission or other income to a DISC by allowing combined taxable income to be computed taking into account only the "marginal," or "variable," costs of producing exported items. The marginal costs taken into account under section 1.994-2, Income Tax Regs., generally include only *direct* production costs, i.e., costs of labor and materials identifiable with particular units of the product or which become an integral part of the specific product. Sec. 1.994-2(b)(2)(i), Income Tax Regs., referring to sec. 1.471-11(b)(2)(i), Income Tax Regs.[9]

---

[9]Export promotion expenses are also treated as "marginal costs" for this purpose, but only if the taxpayer claims such costs for purposes of the "ten percent" allowance contained in sec. 994(a)(2). Sec. 1.994-2(b)(2)(ii), Income Tax Regs.

An important limitation on the use of marginal costing in computing combined taxable income is imposed by section 1.994-2(b)(3), Income Tax Regs. More specifically, the "overall profit percentage limitation" (hereafter, OPPL) limits combined taxable income under marginal costing to a percentage of gross receipts from export sales. Such percentage, referred to as the "overall profit percentage" (hereafter, OPP) is a measure of worldwide sales profitability, with "profitability" being expressed through a comparison of worldwide taxable income with worldwide gross receipts. See sec. 1.994-2(c)(2)(i), Income Tax Regs. (defining OPP). The OPPL essentially limits the "profitability" of export sales, for purposes of computing taxable income under marginal costing, to the "profitability" of worldwide sales, or "overall" profitability, of the product or product line (determined under a full costing method). That concept may be expressed mathematically as follows:

$$\begin{array}{l}\text{Combined taxable income} \\ \text{from export sales of product} \\ \text{or product line} \\ \text{(subtracting marginal} \\ \text{costs only)}\end{array} \leq \text{OPPL} = \dfrac{\begin{array}{l}\text{Combined taxable} \\ \text{income from} \\ \text{worldwide sales of} \\ \text{product or product line} \\ \text{(full costing method)}\end{array}}{\begin{array}{l}\text{Gross receipts from} \\ \text{worldwide sales} \\ \text{of product or} \\ \text{product line}\end{array}} \times \begin{array}{l}\text{Gross} \\ \text{receipts} \\ \text{from} \\ \text{export} \\ \text{sales} \\ \text{of} \\ \text{product} \\ \text{or} \\ \text{product} \\ \text{line}\end{array}$$

The above formula represents a four-step procedure. The first step is to tentatively compute the combined taxable income of the DISC and its related supplier from export sales, taking into account marginal costs only. The second step is to compute the OPP, by dividing the taxable income of the DISC and its related supplier from worldwide sales of the product or product line (using full costing) by the gross receipts from such worldwide sales.[10] The third step is to determine the OPPL, by multiplying the OPP by the gross receipts from export sales of the product or product line. The fourth step is to compare the combined taxable income

[10]Sec. 1.994-2(c)(2)(iii), Income Tax Regs., provides special rules for determining gross receipts in cases in which property is initially transferred among members of a controlled group of which the DISC is a member.

figure computed in the first step with the OPPL. The lesser of those two amounts must be used as "combined taxable income" for purposes of section 994(a)(2) under the marginal costing method.

By placing a cap on the amount of "combined taxable income" which may result from marginal costing, the OPPL functions to allocate some amount of indirect, or "nonmarginal" costs to export sales. See sec. 1.994-2(e), Income Tax Regs. (examples of application of OPPL). Such allocation of nonmarginal costs occurs when the allocation of marginal costs alone would result in a profit margin for export sales of the product or product line greater than the worldwide (or "overall") profit margin for sales of such product.

If the *full* costing method would result in a higher combined taxable income amount for purposes of section 994(a)(2) than that produced under the rules described above, full costing must be utilized by the taxpayer. The Treasury regulations accomplish that result by way of the definition of "establishing or maintaining a foreign market." More specifically, under section 1.994-2(c)(1), Income Tax Regs., if the combined taxable income from export sales of the product or product line computed under the *full* costing method exceeds the combined taxable income produced after application of marginal costing and the OPPL, the taxpayer is not "seeking to establish or maintaining a foreign market" for purposes of section 994(b)(2) and is not within the category of taxpayers for whom marginal costing is allowed.

In their original returns for the years in issue, Southern Comfort and JDI computed DISC commissions without using the marginal costing method.[11] Rev. Rul. 82-81, 1982-1 C.B. 109, however, authorized a DISC and its related suppliers to file amended returns to change the method of computing commissions in order to claim the maximum permissible amount of DISC commissions under section 994. Southern Comfort and JDI filed such amended returns so as to adopt the marginal costing method, and the amended returns were

---

[11]For Southern Comfort's taxable year ended Apr. 30, 1981, the 50 percent combined taxable income method of sec. 994(a)(2) was applied in the original returns, but using full costing. For Southern Comfort's taxable year ended Apr. 30, 1983, the "4 percent" method of sec. 994(a)(1) was applied in the original returns.

considered by the revenue agent auditing the years in issue.[12] The instant case involves discrete questions arising out of the computation of the OPPL by Southern Comfort and JDI in those amended returns. Petitioner alternatively challenges the validity of the regulation imposing the OPPL.

1. *Inclusion of Excise Tax on Distilled Spirits in Computing "Gross Receipts" from Domestic Sales for Purposes of OPPL*

The first issue we must decide involves the impact of the excise tax on distilled spirits in computing the OPPL.

As shown in the OPPL "formula" above, the denominator of the OPP fraction is "gross receipts from worldwide sales of a product or product line." That denominator includes gross receipts from *domestic* sales and gross receipts from *export* sales of the product or product line. In determining the *domestic* sales component of the OPP denominator in their amended returns, Southern Comfort and JDI *subtracted* from the sales proceeds received from customers an amount equal to the excise tax incurred by Southern Comfort with respect to the liqueur sold. Respondent disallowed such subtraction, which had produced an increase in the OPPL and a concomitant increase in the commissions payable to JDI under marginal costing.[13]

In support of its position, petitioner argues that amounts collected by Southern Comfort from the sale of its liqueur are not Southern Comfort's "gross receipts" to the extent that they represent price increases attributable to Southern Comfort's payment of the Federal excise tax on distilled spirits. Petitioner asserts that Southern Comfort had no beneficial interest in its sales revenue to the extent of the applicable excise tax, and no ownership interest in its liqueur product to the extent of the excise tax lien imposed

---

[12]A first set of amended returns for JDI, which adopted the marginal costing method, was received by the Internal Revenue Service Center in Memphis, Tennessee, on Dec. 2, 1985. The corresponding amended returns of Southern Comfort were delivered to the revenue agent auditing the years in issue on Jan. 24, 1986, and were received by the Internal Revenue Service Center in Cincinnati, Ohio, on July 9, 1987.

A second set of amended returns of JDI and Southern Comfort, reflecting various refinements made during the course of the audit, was received by the Internal Revenue Service Center in Cincinnati, Ohio, on July 10, 1987.

[13]The initial amended return of Southern Comfort for the year ended Apr. 30, 1981, claimed an additional commission expense deduction of $936,112; for the year ended Apr. 30, 1983, an additional commission expense deduction of $525,832 was claimed.

on the distilled spirits from the time that they came into existence. Petitioner characterizes Southern Comfort as a "collector," or "trustee," of the tax imposed on distilled spirits, and cites cases dealing with "implied trusts" in support of such characterization. Petitioner also notes that Southern Comfort's invoices stated that prices would be increased to reflect increases in Federal tax and that the unrelated distillers (who supplied Southern Comfort with neutral spirits) were initially liable for the tax.

Respondent argues that it is inappropriate, for purposes of the OPP, to reduce "gross receipts" to reflect Southern Comfort's liability for the excise tax on distilled spirits because (1) the excise tax is a cost of production not excludable from "gross receipts" under section 993(f) and section 1.993-6, Income Tax Regs., (2) Southern Comfort had dominion and control over the sales proceeds from its liqueur, and was not required to and did not segregate amounts attributable to the excise tax, and (3) Southern Comfort treated the total sales proceeds from its customers as gross receipts for financial accounting and income tax purposes. Respondent also notes the efforts made by Brown-Forman Distillers Corp. to prevent increases in the excise tax as proof that the tax was a cost of production. For the following reasons, we agree with respondent.

For purposes of the DISC provisions, section 993(f) defines "gross receipts" as follows:

SEC. 993(f). GROSS RECEIPTS.—For purposes of this part, the term "gross receipts" means the total receipts from the sale, lease, or rental of property held primarily for sale, lease, or rental in the ordinary course of trade or business, and gross income from all other sources. In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this part as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commissions arose.

Section 1.993-6, Income Tax Regs., further elaborates that:

(a) *General rule.* Under Section 993(f), for purposes of sections 991 through 996, the gross receipts of a person for a taxable year are—

(1) the total amounts received or accrued by the person from the sale or lease of property held primarily for sale or lease in the ordinary course of a trade or business, and

(2) gross income recognized from all other sources * * * .

* * * * * * *

(c) *Nonreduction of total amounts.* For purposes of paragraph (a) of this section, the total amounts received or accrued by a person are not reduced by returns and allowances, costs of goods sold, expenses, losses, a deduction for dividends received under section 243, or any other deductible amounts.

(d) *Method of accounting.* For purposes of paragraph (a) of this section, the total amounts received or accrued by a person shall be determined under the method of accounting used in computing its taxable income.

Section 1.993-6, Income Tax Regs., thus clearly provides that amounts properly treated as costs of goods sold or as deductible expenses may not be subtracted from sales proceeds in determining "gross receipts." Petitioner does not argue that it was incorrect for Southern Comfort to deduct the excise tax on distilled spirits in computing its taxable income from domestic sales, and admits that such tax was treated as part of the "cost of goods sold" in its accounting records. Furthermore, petitioner does not challenge the validity of section 1.993-6, Income Tax Regs.[14]

Petitioner's argument that Southern Comfort functioned as no more than a trustee, or "collector," of the excise tax is not borne out by the excise tax statute or by the cases interpreting such statute.[15] Thus, while Southern Comfort may have passed the *economic* burden of the excise tax on to its purchasers, the statute makes it clear that its failure to do so would not have relieved it of liability. As Justice Holmes stated in the case of *Lash's Products Co. v. United States,* 278 U.S. 175, 176 (1929) (in regard to a tax on soft drinks):

[14]Petitioner argues that "gross receipts," for purposes of the OPPL, should be determined in accordance with sec. 1.9365(b)(5)(Q & A #1), Income Tax Regs., which, by reference to sec. 1.936-6(a)(2)(Q & A #7), Income Tax Regs., excludes excise taxes from gross receipts for purposes of measuring sales of a "possession product." We reject petitioner's argument that "gross receipts" should be given the same meaning for purposes of the OPPL as it is given for purposes of the possessions corporation regulations, since "gross receipts" has been defined separately (and differently) in the applicable DISC regulations. Moreover, we note that the "cost sharing" fraction referred to in sec. 1.936-6(a)(2)(Q & A #7), Income Tax Regs., and cited by petitioner as support for "consistently excluding excise taxes," is a comparison of "possession sales" with "total sales," unlike the OPPL, which compares "taxable income" with "gross receipts." We further note that, in contrast with sec. 1.993-6, Income Tax Regs., the regulations relating to the cost sharing fraction specify that "total sales" *is* to be reduced by "returns and allowances" and indirect taxes on the production of the product. See sec. 1.9366(a)(2)(Q & A #1 and #8), Income Tax Regs.

[15]In connection with its "trustee" argument, petitioner argues that Southern Comfort's sales proceeds were not "amounts received or accrued by *the person* [i.e., Southern Comfort]" within the meaning of sec. 1.993-6(a)(1), Income Tax Regs.

The phrase "passed the tax on" is inaccurate, as obviously the tax is laid and remains on the manufacturer and on him alone. * * * The purchaser does not pay the tax. He pays or may pay the seller more for the goods because of the seller's obligation, but that is all. [Citation omitted.]

Numerous courts, moreover, have held that the excise tax on distilled spirits is *not* a consumer's tax but a tax on the production of distilled spirits, which represents part of the cost of such spirits. See, e.g., *Thompson v. United States,* 142 U.S. 471 (1892); *Schenley Distillers, Inc. v. United States,* 255 F.2d 334, 336 (3d Cir. 1958); *Erie Railroad v. United States,* 140 Ct. Cl. 398, 401 (1957); *Robert Williams & Co. v. State Tax Commission of Missouri,* 498 S.W. 2d 527, 528-529 (Mo. 1973); *Dade County v. Atlantic Liquor Co.,* 245 So. 2d. 229, 231 (Fla. 1970) (where burden of excise tax is upon distillation, and method of taxation was unrelated to time of sale, excise tax is a production cost and face value of Federal excise tax stamp may be included in computation of ad valorem tax on stock in trade); *Hoffman v. City of Syracuse,* 2 N.Y. 484, 141 N.E.2d 605, 608-610 (1957); *Cass v. Colorado Beverage Co.,* 122 Colo. 101, 220 P.2d 867, 870-871 (1950); *Pierce & Hebner, Inc. v. State Tax Commission of Maryland,* 194 Md. 254, 71 A.2d 6, 8 (1950) (rejecting contrary view that distilled spirits excise tax is on the consumer). It is difficult to understand how Southern Comfort may be regarded as a mere "collector," or "trustee," of a tax which is its own, and not the consumer's, to pay. Unlike in *Florists' Transworld Delivery Association v. Commissioner,* 67 T.C. 333 (1976), cited by petitioner, in which the taxpayer's use of "members' advances" was restricted by the taxpayer's bylaws, Southern Comfort's use of the sales proceeds from its customers was not limited in any way, as the customers had no interest in petitioner's disposition of such proceeds.

The fact that Southern Comfort's invoices stated that prices included Federal taxes and would be increased to reflect increases in such taxes is without significance; such pricing terms do not show that Southern Comfort functioned as a "collector" or "trustee," but merely indicate that Southern Comfort was unwilling to accept the business risk of an increase in excise tax between the time of a sales

order and the time of delivery to the customer.[16] We note, moreover, that Southern Comfort generally paid the excise tax on a particular shipment of liqueur prior to collection of the related sales proceeds.

We also reject petitioner's argument that Southern Comfort's liqueur product "belonged to the Government" to the extent of the tax because of the lien imposed by section 5004, thereby imposing a trust on the sales proceeds from the liqueur to such extent. No provision of law imposed such a trust upon the sales proceeds, and the "lien" allegedly creating an "ownership interest" terminated by operation of law at the time the liqueur was withdrawn from bonded premises on determination of the tax. Sec. 5004(a)(2)(A). Southern Comfort did not segregate the sales proceeds allegedly "belonging to the Government" but maintained dominion and control over the total proceeds collected from customers. Moreover, Southern Comfort was under no obligation to charge its customers an amount sufficient to pay for the Government's asserted "ownership interest" in the liqueur. Petitioner's argument that the unrelated distillers' liability for the excise tax demonstrates that Southern Comfort was merely the "collector" of a previously imposed tax is also without merit; the unrelated distillers and Southern Comfort were jointly and severally liable for the excise tax, and the bonding procedure employed by Southern Comfort relieved the unrelated distillers of their liability at the time of transfer to Southern Comfort.

The issue herein is similar to that confronted by this Court and by the Ninth Circuit in *Lucky Lager Brewing Co. v. Commissioner,* 26 T.C. 836 (1956), affd. 246 F.2d 621 (9th Cir. 1957), which also involved the interplay between a Federal excise tax statute and the definition of "gross receipts" in an unrelated income tax provision. In *Lucky Lager,* the taxpayer, a brewing company, was subject to the $8/barrel Federal excise tax on beer, which it paid prior to the sale of the beer. As in the instant case, the excise tax was not stated separately on the taxpayer's invoices, and

---

[16]Southern Comfort's invoices for exported liqueur—upon which no excise tax was imposed—contained the same language about the inclusion of Federal tax as the invoices for domestically sold liqueur, further ·negating the significance of such language.

the taxpayer included the total sales proceeds from customers in income on its income tax returns and deducted the excise tax as part of cost of goods sold. 26 T.C. at 836-837.

The issue in *Lucky Lager* was whether the excise tax on beer could be deducted from sales proceeds, as claimed by the taxpayer, in calculating "gross receipts" for purposes of the excess profits tax "growth formula" (section 435(e)(1) of the Internal Revenue Code of 1939). Under the growth formula provision, taxpayers whose "gross receipts" for a certain time period were 150 percent or more of their "gross receipts" for a preceding time period (referred to as "growth corporations") were entitled to use an alternative formula in calculating income subject to the excess profits tax. The relevant provision in *Lucky Lager* defined "gross receipts" to include "the total amount received or accrued * * * from the sale * * * of stock in trade of the taxpayer." The taxpayer in *Lucky Lager* contended that it was a "growth corporation" entitled to use the alternative formula, based on its position that an amount equal to the beer excise tax should be *excluded* from "gross receipts" in determining whether the 150 percent "growth" test had been met.

In rejecting the taxpayer's argument in *Lucky Lager*, we initially reasoned that inclusion of the excise tax (an item which remained stable in its relationship to units produced) in gross receipts would not frustrate the purpose of the growth formula to measure increases in volume of production. We further stated that:

> Petitioner is in effect asking that we reject a simple and direct application of the term "total amount received" as including everything received by the corporation in its own right, and employ instead a meaning which will give effect to the statutory purpose. We need not determine whether such an approach is permissible * * * . [The excise taxes] were included in the amount received for its stock in trade by petitioner, and we see nothing in the statute or its background which will justify their elimination. It is not contended that such taxes, particularly the Federal tax, are collected by the brewer as a trustee or fiduciary. While it may pass the economic burden of the tax to the purchaser, its failure to do so would not relieve it of the tax liability. [Citations omitted.] It cannot hence be said that amounts collected by petitioner, even though they effectively reimbursed it for the beer tax, were not its own "gross receipts." [26 T.C. at 842-843.]

In affirming our decision in *Lucky Lager*, the Ninth Circuit focused on the taxpayer's liability for the excise tax and on the definition of "gross receipts" in section 435(e) of the 1939 Code, stating that:

As far as we are able to analyze petitioner's contention, it seems to be that the tax, in effect, is on the buyer and that the selling petitioner here in receiving his payment for the beer acted in two capacities; one as a collector for the government of a tax on the buyer and the other as recipient of payment of the remainder of the sales prices for the beer itself. [Fn. ref. omitted.]

We do not agree. The language * * * that "gross receipts" are "the *total* amount received or accrued * * * from the sale * * * of stock in trade" [emphasis supplied] is irrefutably plain. It is a logical absurdity to contend that the "total amount received" from the sales is not what the customer paid but a lesser amount determined by a deduction of a particular tax paid, here required to be paid and in fact paid by the seller, before the delivery of the beer.

[246 F.2d at 622-623.]

The Ninth Circuit went on to quote the case of *Liggett & Myers Tobacco Co. v. United States*, 299 U.S. 383 (1937), for the proposition that:

True the limit of time for making payment is when the product is sold or removed, but this is a privilege designed to mitigate the burden; it indicates no purpose to impose the tax upon either sale or removal. [246 F.2d at 623.]

We find the reasoning of the Ninth Circuit in *Lucky Lager* equally applicable herein.[17] See also *Hoffman v. City of Syracuse*, 2 N.Y. 484, 141 N.E.2d 605, 608-610 (1957) (for purposes of local sales tax, "receipts" from retail sales should not be reduced by excise tax on distilled spirits, which is production cost).

In addition to arguing that Southern Comfort was no more than a "collector" or "trustee" of the excise tax, petitioner argues that the inclusion of amounts attributable to the excise tax in domestic gross receipts but not export gross receipts is an "apples and oranges" comparison that

---

[17]Although our opinion in *Lucky Lager Brewing Co. v. Commissioner*, 26 T.C. 836 (1956), affd. 246 F.2d 621 (9th Cir. 1957) states that the taxpayer had not argued that it was only a trustee or fiduciary of the excise tax, the Ninth Circuit opinion suggests that such argument would necessarily have failed. More specifically, the Ninth Circuit emphasized that the excise tax was *imposed* upon beer manufacturers, a fact inconsistent with characterizing such manufacturers as "trustees" collecting the tax on behalf of the Government.

gives greater "weight" to domestic sales, producing "distortions" in the OPPL. Petitioner also characterizes respondent's position as involving the "exclusion" of excise tax from the numerator of the OPP and its inclusion in the denominator. We find such characterization misleading. Because the numerator of the OPP is a "taxable income" figure, increases in the selling price of liqueur to reflect an excise tax cost *properly* result in a "wash" with respect to such numerator, since the excise tax is also a deductible expense. The OPP measures profitability by a comparison of taxable income with gross receipts. So long as amounts attributable to the excise tax are included in both *gross* income and gross receipts from domestic sales and excluded in computing both gross income and gross receipts from export sales, the amounts being "compared" as a measure of profitability are not "apples and oranges."[18]

Contrary to petitioner's argument, the fact that application of the OPPL results in the allocation of some excise tax cost to gross receipts from export sales is not proof of any "distortion;" section 994(b)(2) specifically authorizes rules for the "allocation" of expenditures between export gross receipts and domestic gross receipts. Moreover, the fact that gross receipts from domestic sales may be higher on account of an excise tax cost does not mean that domestic sales have been given too much "weight" in the OPP. Petitioner ignores the fact that gross receipts from export sales may also be increased on account of costs or factors not applicable in the domestic market. We also reject petitioner's argument that respondent's position results in a "disincentive to export" that "defeats the purpose of the DISC provisions." As pointed out by respondent, the very feature of the excise tax that gives rise to the instant dispute—i.e., the fact that such tax is not imposed on *exported* liquor—is, in itself, an incentive to export.

In a similar vein, we reject petitioner's argument that, because its method of computing the OPPL produces a lower "taxable income per case" for exported liqueur than for exported and domestic liqueur determined on an aggregate basis, such method should be upheld. Petitioner's argument

---

[18]Petitioner, while repeatedly asserting that the inclusion of excise taxes in domestic but not export gross receipts frustrates the purpose of the OPPL (to measure relative profitability),

is essentially that, if its method produces a result in harmony with the purpose of the OPPL,[19] it is correct. Assuming without deciding that petitioner's position in fact produces a result in harmony with such purpose,[20] such "end justifies the means" argument nevertheless must fail where the "means" contravenes the plain language of section 1.993-6, Income Tax Regs., defining "gross receipts" for purposes of the OPPL. As noted above, petitioner does not challenge the validity of that regulation, and we are unwilling to rewrite the regulation herein. Accordingly, we hold that, for purposes of the OPPL, "gross receipts" may not be reduced by amounts attributable to the Federal excise tax on distilled spirits.

2. *Effect of Excise Tax in Determining Gross Receipts from Export Sales for Purposes of OPPL*

Petitioner alternatively argues that, if we sustain respondent's position that gross receipts from domestic sales are determined without reduction for the excise tax on distilled spirits, then gross receipts from export sales, for purposes of the OPPL, should be *increased* to reflect Southern Comfort Inc.'s "relief from liability" for the excise tax with respect to such sales.[21]

Petitioner reasons that, upon export of a quantity of liqueur, the excise tax lien on such liqueur is relieved, giving rise to income. Petitioner cites *Crane v. Commissioner,* 331 U.S. 1 (1947), and *Commissioner v. Tufts,* 461 U.S. 300 (1983), for the proposition that relief from a nonrecourse liability gives rise to income upon disposition of the property securing the liability. In further support of its

never has argued that a comparison of "taxable income" with "gross receipts" is, in itself, an inappropriate way of measuring profitability. Petitioner's argument, however, if taken to its logical conclusion, would require numerous other subtractions from "gross receipts" attributable to other costs of production, significantly changing the profitability quotient specified in the OPP.

[19] Petitioner argues with respect to the excise tax issue that the purpose of the OPPL is "to limit the effect of marginal costing so that export sales are not more profitable than worldwide sales." Petitioner measures compliance with such purpose by presenting various calculations of "taxable income per case" of domestic and exported liqueur. Petitioner alternatively argues below that the OPPL is invalid as lacking authority in sec. 994.

[20] Respondent asserted in his opening remarks at trial that the "taxable income per case" amounts presented by petitioner might be misleading because of differences in the cases.

[21] Although inclusion of the excise tax amount in gross receipts from export sales increases the denominator of the OPP, petitioner's alternative position nevertheless produces an increase in the OPPL due to the increase in export gross receipts, by which the OPP is multiplied.

position that relief from the excise tax lien generates "gross receipts" from export sales, petitioner draws our attention to the fact that, prior to 1980, Southern Comfort actually *paid* the excise tax with respect to exported liqueur and then received a "drawback" of such amounts.[22] Petitioner reasons that, at the time the OPPL regulation was promulgated, "gross receipts" would have included such "drawbacks," and Congress did not intend the procedural change in the excise tax statute to reduce allowable DISC commissions.

We find petitioner's alternative position without merit. In *Commissioner v. Tufts, supra,* the Supreme Court stated that:

Unless the outstanding amount of the mortgage is deemed to be realized [at the time of sale], the mortgagor effectively will have received *untaxed income* at the time the loan was extended and will have received an *unwarranted increase in the basis* of his property. * * * [461 U.S. at 310. Fn. ref. omitted and emphasis supplied.]

In the instant case, such reasoning is inapplicable. No untaxed "income" is produced upon termination of the lien imposed by section 5004, because there was no transfer of funds to Southern Comfort giving rise to the lien. While the termination of a liability may give rise to income if the taxpayer previously derived some "tax benefit" from the liability, petitioner does not argue that the tax benefit rule applies; there is no contention that the termination of liability related to excise taxes which had been deducted by Southern Comfort in prior tax years. Cf. *Turtle Wax, Inc. v. Commissioner,* 43 T.C. 460 (1965) (where taxpayer deducted Federal excise tax on watches as part of the cost of the watches and in later years received refund of the excise tax, the refunds were properly treated as income). Nor has petitioner shown that, under Southern Comfort's method of accounting, its claimed basis in the *exported* liqueur reflected a Federal excise tax cost. See sec. 1.1001-2(a)(3), Income Tax Regs. (rule that amount realized from sale includes liabilities from which transferor is discharged does not apply to liabilities incurred on the acquisition of

[22]Petitioner notes that such prior law was still applicable during the first month of JDI's taxable year ended Nov. 30, 1980. Commissions reported by JDI for such year were deducted by Southern Comfort during its taxable year ended Apr. 30, 1981.

property but not taken into account in determining the transferor's basis).

Petitioner's alternative contention also runs counter to section 108(e)(2), which applies to both bankruptcy and nonbankruptcy transactions, and states:

(2) INCOME NOT REALIZED TO EXTENT OF LOST DEDUCTIONS.—No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction.[23]

Southern Comfort deducted the Federal excise tax on distilled spirits as an expense on line 17 of its returns. If Southern Comfort had incurred an excise tax liability on liqueur which eventually would be exported, the extinguishment of such liability would render the deduction unavailable, but "lost deductions" do not, under section 108(e)(2), give rise to income.[24]

We also reject petitioner's argument concerning pre-1980 excise tax procedure. An excise tax "drawback," if received in the same year that the tax was paid, properly would be treated as an adjustment to Southern Comfort's cost basis in its exported liqueur and not as an additional item of "gross receipts." See *Freedom Newspapers, Inc. v. Commissioner,* T.C. Memo. 1977-429.

We therefore hold that Southern Comfort is not entitled to increase "gross receipts" from export sales, for purposes of the OPPL, by any amount attributable to the excise tax on distilled spirits.

## 3. *Validity of OPPL Regulation*

Petitioner also alternatively argues that section 1.994-2(b)(3), Income Tax Regs., imposing the OPPL, is invalid. In support of its position, petitioner argues on brief that:

---

[23]Sec. 108(e)(2) was enacted as part of the Bankruptcy Tax Act of 1980 and applies to nonbankruptcy transactions occurring after Dec. 31, 1980. Pub. L. 96-589, 94 Stat. 3389, 3411-3412. See also S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 630. Counsel for petitioner recognized the applicability of sec. 108(e)(2) to the excise tax issue in a letter stipulated into evidence in the instant case. The letter expressed petitioner's position on the issues raised in a request for technical advice submitted by the District Director with respect to the matters in issue herein.

[24]Petitioner's argument assumes that the lien imposed by sec. 5004 at the time distilled spirits came into existence constituted a fixed and determinable excise tax "liability." We do not imply any viewpoint as to the time at which the excise tax "liability" attaches, as it is unnecessary to decide such issue herein.

Code Section 994(b)(2) provides for the marginal cost method for determining taxable income from export sales where a taxpayer is attempting to establish or maintain a foreign market. That section does not authorize the percentage limitation imposed by Regulation Section 1.994-2(b)(3). Without such authorization by the Code, the percentage limitation imposed by the Regulation is invalid.

\* \* \* \* \* \* \*

The policy behind section 994(b)(2) was to stimulate exports by increasing their after tax profitability. Section 994(b)(2) carried out that policy, by permitting taxpayers to price exports on a marginal cost basis to increase export taxable income and the DISC commissions. Respondent's regulation in issue does just the opposite. It requires export taxable income and the DISC commissions to be decreased. Respondent's regulation defeats, rather than carries out, the purpose of the statute. The Regulation is therefore invalid.

Petitioner also cites several cases in which DISC regulations have been held invalid. We disagree with petitioner's analysis and hold that the challenged regulation is valid.

The challenged regulation, section 1.994-2(b)(3), Income Tax Regs., was issued under the specific authority of section 994(b)(2) and is thus classified as a "legislative regulation." Accordingly, the regulation is entitled to "even greater weight and deference than are accorded to interpretive regulations." *Olson v. Commissioner,* 81 T.C. 318, 323 (1983). See also *Dresser Industries v. Commissioner,* 92 T.C. 1276, 1290 (1989), on appeal (5th Cir., October 23, 1989); *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982); *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981). In *Rowan Cos. v. United States, supra,* the Supreme Court stated that "where the Commissioner acts under specific authority, our primary inquiry is whether the interpretation or method is within the delegation of authority." 452 U.S. at 253. Legislative regulations must be sustained unless they are "unreasonable and plainly inconsistent" with the statute they are designed to implement. *Estate of Gunland v. Commissioner,* 88 T.C. 1453, 1457 (1987). The challenged regulation is neither unreasonable nor plainly inconsistent with section 994(b)(2).

Section 994(b)(2) provides the Secretary with broad discretion to prescribe rules regarding allocation of expenditures. The OPPL operates as an allocation rule, allocating some of the indirect production costs of a product or product line to

export sales in circumstances in which the profit margin on export sales (determined under marginal costing) otherwise would exceed the worldwide profit margin on sales of such product. Petitioner's argument misinterprets section 994(b)(2) as a per se rule that permits only marginal costs to be taken into account in computing combined taxable income. Petitioner's argument also ignores the plain language of section 994(b)(2), which provides for rules for the "allocation" of expenditures. The term "marginal costing" itself appears only in the heading of subsection 994(b), entitled "Rules for Commissions, Rentals, and Marginal Costing." See section 7806(b) (descriptive matter relating to contents of Internal Revenue Code is of no legal effect), and the legislative history of section 994(b)(2) states that marginal costing may be allowed by regulation "in the appropriate cases." S. Rept. 92-437 (1971), 1972-1 C.B. 559, 619.

Petitioner's argument that section 994(b)(2) "does not authorize the percentage limitation imposed by the challenged regulation" implies that every specific provision or requirement in legislative regulations must find *specific* support in the statute. Such notion contradicts the purpose of specific delegations of rule-making authority—to allow the Secretary to promulgate rules which, unless arbitrary, will themselves have the force and effect of law. *Watson Land Co. v. Commissioner*, 799 F.2d 571, 579 (9th Cir. 1986); *Wolter Construction Co. v. Commissioner*, 634 F.2d 1029 (6th Cir. 1980); *Craigie, Inc. v. Commissioner*, 84 T.C. 466, 471 (1985). As stated by the Sixth Circuit (to which the instant case is appealable) in *Wolter Construction Co. v. Commissioner, supra* at 1035, quoting *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979):

This grant of legislative authority insures that "the rules will be written by 'masters of the subject,' *United States v. Moore*, 95 U.S. 760, 763 (1878), who will be responsible for putting the rules into effect."

We hold that the OPPL is within the broad delegation of regulatory authority contained in section 994(b)(2).

The cases cited in petitioner's brief in which DISC regulations have been held invalid are distinguishable from

the instant case in that they all involve interpretative regulations which improperly imposed additional requirements or created additional exceptions with respect to unambiguous statutory provisions. In *Durbin Paper Stock Co. v. Commissioner,* 80 T.C. 252 (1983), we invalidated interpretative regulations which imposed upon DISC's a "paid-in" capital requirement (sec. 1.992-1(d)(1), Income Tax Regs.) and a "separate bank account" requirement (sec. 1.992-1(a)(6), Income Tax Regs.) in addition to the statutorily prescribed requirement that a DISC have outstanding stock with a par or stated value of at least $2,500 on each day of the taxable year. In invalidating such regulations, we found the statutory requirement of $2,500 par or stated value "unambiguous" and the regulations without any statutory authority. In *Arrow Fastener Co. v. Commissioner,* 76 T.C. 423 (1981), we invalidated an interpretative regulation limiting the amount of obligations issued by the Export-Import Bank of the United States which may constitute "qualified export assets" (sec. 1.993-2(h)(2), Income Tax Regs.). The statute in that case provided without exception that such obligations constitute qualified export assets, and we reasoned that, in light of the unequivocal language of the statute, the regulation was an inappropriate attempt to amend the statute. In *Caterpillar Tractor Co. v. United States,* 218 Ct. Cl. 517 (1978), the Court of Claims similarly held that a regulation excepting from the definition of "export property" property sold by a DISC to a related Western Hemisphere Trade Corp. was invalid in that it improperly "legislated" an exception to the definition of "export property." The instant case, unlike such cases, presents a situation in which the statute specifically authorizes the Secretary of the Treasury to create rules and in which there is no conflict with an unambiguous term of the statute. See *Rowan Cos. v United States, supra* at 253 (explaining that interpretative regulations are owed less deference because, unlike legislative regulations, they can be "measured against" specific Code provisions).

Petitioner, however, argues that the OPPL is inconsistent with the purpose of section 994(b)(2) to stimulate exports. We disagree. Section 994(b)(2) by its terms limits the use of marginal costing to taxpayers "seeking to establish or

maintain a market for export property." The OPPL renders the marginal costing method beneficial only to those taxpayers whose profit margin for export sales—determined under a full costing method—is less than their worldwide profit margin with respect to sales of such product or product line.[25] We find such effect reasonable in that it excludes from marginal costing taxpayers who logically would not need special tax incentives to be encouraged to export—i.e., those taxpayers whose export profit margin already is higher than their worldwide profit margin with respect to the product in question. Taxpayers already enjoying a higher profit margin on export sales than on worldwide sales of a product or product line hardly would seem to be those Congress had in mind when it granted the Commissioner regulatory authority in section 994(b)(2) to allow special rules for those "seeking to establish or maintain a market for export property."[26]

In addition to excluding from the use of marginal costing taxpayers whose export profit margin is higher than their worldwide profit margin (in conjunction with the definition contained in section 1.994-2(c)(1), Income Tax Regs.), the OPPL also sets a cap on combined taxable income for purposes of section 994(a)(2). We do not find such cap unreasonable or inconsistent with the underlying statute. As noted above, there is no indication in section 994(b)(2) or its legislative history that Congress intended to allow an unqualified use of marginal costing to determine combined taxable income. See *Wolter Construction Co. v. Commissioner, supra* at 1039 (regulation limiting deduction sus-

---

[25]As discussed *supra*, the definition of "establishing or maintaining a foreign market" contained in sec. 1.994-2(c)(1), Income Tax Regs., dictates that other taxpayers use the full costing method. Petitioner has not challenged the validity of sec. 1.994-2(c)(1), Income Tax Regs. We refer to the operation of such regulation herein to the extent that it is intertwined with the operation of the challenged OPPL regulation.

[26]Although neither sec. 994 nor its legislative history provides any insight into the meaning of "seeking to establish or maintain a market," the exclusion from such term of taxpayers enjoying a higher profit margin on export sales than on worldwide sales is consistent with the use of the phrase "establishing or maintaining a market" in the sec. 482 regulations. More specifically, sec. 1.482-2(e)(2)(iv), Income Tax Regs. (which was promulgated in 1968, several years before the enactment of the DISC provisions), states in relevant part that "one of the circumstances which may affect the price of property is the fact that the seller may desire to make sales at less than a normal profit for the primary purpose of establishing or maintaining a market for his products." See also Webster's Third New International Dictionary 1362 (1986) (defining "maintain" to include "to preserve from failure or decline" and "to sustain against opposition or danger").

tained where "conspicuously absent from the Code is any clear provision which allows the deduction in full"). Rather Congress left it to Treasury to fashion rules for the allocation of expenditures. The cap created by the OPPL, in our view, functions as a reasonable allocation rule.[27]

Our conclusion that the challenged regulation is valid is bolstered by Congressional action related to the enactment of the intercompany pricing rules for Foreign Sales Corporations (FSC's), which generally replaced DISC's as part of the Deficit Reduction Act of 1984, Pub.L. 98-369, 98 Stat. 494 et seq. The intercompany pricing rules for transactions between FSC's and related parties are contained in section 925. The major difference between sections 925 and 994 is that a FSC, unlike a DISC, must perform "significant economic functions" (specified in section 925(c)) in order to take advantage of the safe-harbor pricing methods contained in section 925(a)(1) and (2). Those safe-harbor methods are intended to approximate arm's-length pricing. See Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984 (S. Prt. 98-169, Vol. I, April 2, 1984) (hereafter referred to as "Senate Finance Committee Explanation") at 646; Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (J. Comm. Print 1984) (hereafter referred to as "Joint Committee Explanation") at 1048 n.4, 1054-1055.

Under the safe-harbor rule of section 925(a)(2) (corresponding to section 994(a)(2)), an FSC may derive taxable income equal to 23 percent of the "combined taxable income" of the FSC and its related supplier attributable to "foreign trading gross receipts" derived from the sale of export property.[28] Section 925(b) provides:

---

[27]Congress' intent to place limits on "combined taxable income" for purposes of sec. 994(a)(2) also is supported by a statement in the legislative history of sec. 994 to the effect that "income may not * * * be allocated to the DISC [under the rules of section 994(a)(1) and (2)] to the extent that it would result in the related person who sold the products to the DISC incurring a loss on the sale." S. Rept. 92-437, 1972-1 C.B. 559, 618. Such a "no loss" rule suggests that Congress intended to prevent unlimited allocation of taxable income to the DISC at the expense of its related supplier, a policy which also is furthered by the OPPL.

[28]"Foreign trading gross receipts" under the FSC provisions corresponds to "qualified export receipts" under the DISC provisions. However, FSC's are generally required to meet certain "foreign management" and "foreign economic presence" requirements to derive "foreign trade gross receipts." See Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (J. Comm. Print 1984) (hereafter referred to as "Joint Committee Explanation") at 1047-1048.

SEC. 925(b). RULES FOR COMMISSIONS, RENTALS, AND MARGINAL COSTING.—The Secretary shall prescribe regulations setting forth—

    (1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and

    (2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a FSC is seeking to establish or maintain a market for export property.

An examination of section 925(b)(2) reveals that it is identical to section 994(b)(2) except for the replacement of the word "FSC" in place of "DISC." Thus, in replacing the DISC provisions with the FSC provisions, Congress left intact section 994(b)(2), basically renumbering and incorporating the provision as section 925(b)(2).

The Senate Finance Committee Explanation states:

In general, where the provisions of the bill are identical or substantially similar to the DISC provisions under present law, the committee intends that rules comparable to the rules in regulations issued under those provisions will be applied to the FSC. [Senate Finance Committee Explanation at 636.]

See also Joint Committee Explanation at 1043.[29]

Moreover, Treasury has promulgated sections 1.925(b)-1T(b)(2) and 1.925(b)-1T(c)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg. 6428, 6455-6456 (March 3, 1987), which impose an OPPL and define the OPP for purposes of section 925(b)(2) in virtually identical fashion as the challenged regulation and section 1.994-2(c)(2)(i), Income Tax Regs.[30]

Accordingly, we hold that the challenged regulation is valid.[31]

---

[29]The Joint Committee Explanation describes the marginal costing rules of sec. 994 in its "Prior Law" discussion as follows:

Under marginal costing rules, if the 50-50 method is used by the DISC, only the marginal or variable production and sales costs for the export property need be included in the computation of combined taxable income. In general, the benefits of marginal cost pricing are limited to instances where the variable cost margin on the DISC's export sales of a product is less than the full cost margin on the combined product sales by the DISC and the related supplier. [Joint Committee Explanation at 1039.]

[30]Congress' focus on the DISC intercompany pricing regulations in 1984 is confirmed by its suggestion that the Secretary of the Treasury consider whether the DISC regulations accomplished the purpose of preventing pricing at a loss to the related supplier, such "no loss" rule (*supra* note 27) having been incorporated in the FSC provisions. See Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on Mar. 21, 1984 (S. Prt. 98-169, Vol. I, Apr. 2, 1984) at 649.

[31]No implication is intended as to the validity of sec. 1.994-2, Income Tax Regs., except as it concerns imposition of the OPPL.

4. *Aggregation Election under Section 1.994-2(c)(2)(ii), Income Tax Regs.*

Section 1.994-2(c)(2)(ii), Income Tax Regs., provides:

At the annual option of the related supplier, the overall profit percentage for the DISC's taxable year for all products and product lines may be determined by aggregating the amounts described in subdivision (i)(a) [combined taxable income from worldwide sales] and (b) [gross receipts from worldwide sales], of this subparagraph of the DISC, and all domestic members of the controlled group (as defined in section 1.993-1(k)) of which the DISC is a member, for the DISC's taxable year and for taxable years of such members ending with or within the DISC's taxable year.

During the years in issue, both Southern Comfort and Jack Daniel were "related suppliers" of JDI and members of a "controlled group" within the meaning of the above-quoted regulation. In the amended returns filed for the years in issue, the commissions payable by Southern Comfort to JDI were computed by aggregating Southern Comfort's gross receipts and combined taxable income with that of Jack Daniel in determining the applicable OPP. The commissions payable by Jack Daniel to JDI were computed without such aggregation. In his notice of deficiency, respondent determined that:

Southern Comfort may not aggregate with Jack Daniel for purposes of calculating its overall profit percentage, unless Jack Daniel timely makes a conforming election to aggregate * * *

Petitioner argues that section 1.994-2(c)(2)(ii), Income Tax Regs., does not require a "conforming election" to be made by any other member of the controlled group in order for aggregation to be allowed, and that such a requirement would defeat the purpose of the regulation. Respondent argues that section 1.994-2(c)(2)(ii), Income Tax Regs., was drafted with a single "related supplier" in mind, rather than multiple "related suppliers" (as are present in the instant case), and that in order to avoid "distortions" in taxable income, Southern Comfort and Jack Daniel should be treated as a single taxpayer for purposes of such regulation. We refuse to adopt respondent's interpretation of section 1.994-2(c)(2)(ii), Income Tax Regs.

Section 1.994-1(a)(3)(ii), Income Tax Regs., which was promulgated at the same time as section 1.994-2(c)(2)(ii), Income Tax Regs., defines "related supplier" as follows:

(ii) The term "related supplier" means a related party which *singly* engages in a transaction directly with the DISC which is subject to the rules of section 994 and this section. However, a DISC *may have different related suppliers* with respect to different transactions. If, for example, X owns all the stock of Y, a corporation, and of Z, a DISC, and sells a product to Y which is resold to Z, only Y is the related supplier of Z, and, thus, only the resale from Y to Z is subject to section 994 and this section. If, however, X sells directly to Z and Y also sells directly to Z, then, as to the transactions involving direct sales to Z, each of X and Y is a related supplier of Z. [Emphasis supplied.]

Such definition reveals that Treasury was aware of the possibility of multiple related suppliers and intended the term "related supplier" to be read in the singular. We reject respondent's argument that "regulations, like statutes, are often written in the singular, but cover the plural," as being inapposite to the instant case in which a definition section clearly distinguishes the singular from the plural.

Respondent concedes that the aggregation rule of section 1.994-2(c)(2)(ii), Income Tax Regs., represents a "liberalization" of the rules of section 994. Assuming that to be the case, we agree with petitioner that respondent's position would defeat such "liberalizing" purpose. Since a "related supplier" would apply the aggregation rule only to *increase* the applicable OPP, requiring a conforming election from the other "related suppliers" would force those other suppliers into using a *lower* OPP than that to which they would have been entitled separately. We note, moreover, that there is no provision in section 994 or its regulations requiring related suppliers from the same controlled group to use the same intercompany pricing method; under the methods contained in sections 994(a)(1) and 994(a)(3), the OPP is irrelevant, and the "conforming election" desired by respondent would be illogical and of no effect.[32]

[32]During the years in issue, the computations required under sec. 994(a)(1) and (a)(2) were made on Schedules P to Forms 1120-DISC. The instructions for such schedules indicate that a separate schedule was to be completed for each transaction or group of transactions. Each schedule contained a box to be checked to indicate application of the aggregation rule, and nothing in the schedules or instructions thereto suggested that the election of aggregation on one Schedule P required its election on any other Schedule P accompanying the return.

Petitioner's interpretation of section 1.994-2(c)(2)(ii), Income Tax Regs., is, moreover, consistent with various other provisions of the section 994 regulations. The OPPL generally is computed using the item, product, or product-line grouping used for the DISC intercompany profit determinations. Sec. 1.994-2(c)(3)(i), Income Tax Regs. Under section 1.994-2(c)(3)(ii), Income Tax Regs., however, the taxpayer may, on an annual basis, elect to calculate the OPP using a broader product line grouping than that used in determining "combined taxable income" from export sales under section 994(a)(2). Thus, the OPP may be determined, in the case of a single taxpayer, by including in "gross receipts" and "combined taxable income" amounts attributable to sales which are not subject to the marginal costing rules at all (so long as the product grouping is permissible under section 1.994-1(c)(7), Income Tax Regs.). See also sec. 1.994-1(e)(1)(iii), Income Tax Regs. Such rule supports the notion that the OPP may be calculated by including data from other sales which are not themselves subject to the same OPPL.

We are not bound by respondent's reading of his regulations. *Hunt v. Commissioner,* 80 T.C. 1126, 1144 (1983). In the instant case, respondent's reading of section 1.994-2(c)(2)(ii), Income Tax Regs., is contrary to the plain language of such regulation, as clarified by the definition of "related supplier" contained in section 1.994-1(a)(3)(ii), Income Tax Regs. Accordingly, we hold that Southern Comfort was entitled to aggregate its gross receipts and combined taxable income with that of Jack Daniel without a conforming election being made by Jack Daniel.

In light of our holdings in favor of respondent on the excise tax issue and the validity of section 1.994-2(b)(3), Income Tax Regs., we need not consider respondent's alternative determination that JDI is a disqualified DISC for its tax year ended November 30, 1982, by reason of Southern Comfort's alleged failure to timely pay the increased commissions claimed on its amended returns.[33]

---

[33]The explanation of adjustments in respondent's notice of deficiency raises the alternative issue of DISC disqualification as follows:

It is further determined that were your DISC commission expenses allowed as claimed, you would not have timely paid the required amount within sixty days of the end of the DISC's year ended November 30, 1982. The allowance of your informal claims on the claimed

Respondent's motion for leave to amend his answer with respect to that issue therefore is moot.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

reduction of domestic gross receipts and the claimed aggregation would result in the disqualification of DISC status to Jack Daniel International, because the adjusted basis of the qualified export assets of the DISC failed to equal orexceed 95 percent of the sum of the adjusted basis of all its assets at the close of the taxable year.

In his opening brief, petitioner states that the issue of DISC disqualification would arise only if petitioner prevailed on the excise tax *and* aggregation issues or if the OPPL were invalidated. Respondent's reply brief similarly states that the Court need reach the DISC disqualification issue only if it were to decide "the OPPL issue" in favor of petitioner, and later refers to the consequences of Southern Comfort having been correct on both the "gross receipts and the aggregation issue." Accordingly, we have proceeded on the basis that the fact that petitioner prevailed on the aggregation issue is not in itself sufficient to raise the DISC disqualification issue.