ST. JUDE MEDICAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5274-89.          Filed October 31, 1991.

*Kurtis A. Greenley, David L. Hallett,* and *John S. Jagiela* for the petitioner.*

*William E. Bonano* and *Mary E. Wynne,* for the respondent.

## OPINION

WRIGHT, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1979 | $194,794 |
| 1981 | 233,956 |
| 1982 | 812,906 |
| 1983 | 832,559 |

After concessions, the deficiency determined for taxable year 1979 is no longer in issue. The issues remaining for decision with respect to taxable years 1981, 1982, and 1983 are:

(1) Whether the research and development expense allocation moratorium under section 223 of the Economic Recovery Tax Act of 1981 (sec. 223 of ERTA), Pub. L. 97-34, 95 Stat. 172, 249, is applicable to the computation of combined taxable income;

(2) whether research and development expenses attributable to medical devices which were never placed into production or offered for sale are allocable and apportionable as provided by section 1.861-8(e)(3), Income Tax Regs., in computing combined taxable income for purposes of the

---

*Brief amicus curiae was filed by *James P. Fuller* and *Joel V. Williamson* as attorneys for Intel Corp.

domestic international sales corporation (DISC) intercompany pricing rules and, if so;

(3) whether section 1.861-8(e)(3), Income Tax Regs., as incorporated by section 1.994-1(c)(6)(iii), Income Tax Regs., for purposes of the DISC intercompany pricing rules, is an invalid regulation:

(a) to the extent it requires allocation of research and development expenses using Standard Industrial Classification (SIC) product categories for the computation of combined taxable income;

(b) to the extent it prohibits an allocation of research and development expenses using industry and trade usage product categories;

(c) to the extent it precludes the use of the "wholesale trade category" in allocating research and development expenses; and

(d) to the extent it precludes the use of the "exclusive geographic apportionment method" in apportioning research and development expenses.

The parties submitted this case fully stipulated pursuant to Rule 122.[1] The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein.

Petitioner, a Minnesota corporation, had its principal place of business in St. Paul, Minnesota, when its petition was filed. Petitioner is an accrual basis, calendar year taxpayer which develops, manufactures, and sells medical products. Petitioner's only product during the years at issue was an artificial heart valve. Generally, in the medical products business foreign sales precede domestic sales because of the time required to obtain Food and Drug Administration clearance to market medical products in the United States. Petitioner obtained clearance to market its heart valves in the United States on December 17, 1982.

On December 20, 1979, petitioner initiated a research and development project in order to produce a cardiac pacemaker. Due to escalating costs and startup problems, petitioner terminated its effort to develop the cardiac pacemaker in March of 1981. In April of 1980, petitioner

---

[1]All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

entered into a joint research and development project in order to produce an implantable insulin pump. Petitioner abandoned its effort to develop implantable insulin pumps in 1983. No sales of a cardiac pacemaker or insulin pump were ever attempted by petitioner or its subsidiaries. Cardiac pacemakers, insulin pumps, and heart valves constitute separate products or product lines under recognized industry or trade usage in the medical goods manufacturing industry.

On April 20, 1980, petitioner incorporated St. Jude International Sales Corp. (International), a wholly owned subsidiary, for the purpose of qualifying it as a DISC and obtaining the tax deferral advantages available pursuant to the DISC provisions. International, an accrual basis taxpayer, operated on a January 31 fiscal year. Pursuant to a DISC commission agreement, petitioner was to pay International the maximum commission allowable under section 994 and the applicable regulations for all export sales of petitioner's product. International qualified as a DISC under section 992 during its fiscal years 1981 through 1984. International incurred no research and development expenses during the years in issue.

Petitioner's total sales, domestic sales, export commission sales, and the percentage of export commission sales to total sales during calendar year 1981, 1982, and 1983 were:

| Year | Total sales | Domestic sales | Export commission sales involving International | % of export sales to total sales |
|------|------------|----------------|-----------------------------------------------|----------------------------------|
| 1981 | $13,206,395 | $4,953,507 | $8,252,888 | 62.48% |
| 1982 | 17,528,098 | 6,285,996 | 11,242,102 | 64.14 |
| 1983 | 25,624,428 | 11,847,468 | 13,776,960 | 53.76 |

During each year at issue, 100 percent of petitioner's research and development activity was performed in the United States. Because the terms of sale for International were f.o.b., St. Paul, Minnesota, International bore the expense and risk of loss of putting a shipment into possession of the carrier.

A preliminary requirement in determining the tax deferral benefits available to petitioner through section 944(a)(2) of the DISC intercompany pricing rules is the computation of the "combined taxable income" of petitioner and Interna-

tional. Combined taxable income equals the excess of the gross receipts of the DISC from export commission sales over the total costs of the DISC and its related supplier (petitioner) which relate to the gross receipts. In computing combined taxable income, petitioner failed to allocate any of the research and development expenses attributable to the cardiac pacemaker and the insulin pump to gross receipts from export sales. In addition, petitioner failed to allocate 30 percent of the research and development expenses attributable to the heart valve between gross receipts from export sales and all other gross receipts:

*R&D Allocated Exclusively to All Other Gross Receipts*

| Description | International fiscal year ending | | |
| --- | --- | --- | --- |
| | 1/31/82 | 1/31/83 | 1/31/84 |
| Implantable insulin pump | $390,217 | - - - | - - - |
| Implantable cardiac pacemaker | 390,121 | - - - | - - - |
| 30% exclusive apportionment | 87,719 | $451,123 | $552,200 |
| Cost of terminating implantable insulin pump development | 655,806 | - - - | - - - |
| Total | 1,523,863 | 451,123 | 552,200 |

Respondent recomputed combined taxable income by allocating additional research and development expenses between gross receipts from export sales and all other gross receipts:

| International fiscal year ending | Additional research and development expenses allocated in computing combined taxable income |
| --- | --- |
| 1/31/82 | $1,523,863 |
| 1/31/83 | 451,123 |
| 1/31/84 | 552,200 |

The effect of respondent's determination is to reduce the combined taxable income of petitioner and International during the years in issue, which in turn reduces the amount of commissions deemed paid to International pursuant to section 994(a)(2) by $508,600 in 1981, $143,202 in 1982, and $135,582 in 1983. The reduction in commissions deemed paid to International reduces the amount of income eligible for tax deferral through the DISC provisions. In addition, the reduction in commissions deemed paid reduces the deemed distribution from International to petitioner pursu-

ant to section 995 by $239,353 in 1982, and $69,933 in 1983.

## The DISC Provisions

As part of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, Congress enacted the DISC provisions (secs. 991 through 997) to stimulate exports and grant a Federal income tax deferral opportunity to U.S. firms engaged in exporting through domestic corporations, rather than foreign subsidiaries. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 502, 529.

A DISC is not liable for Federal income tax on its taxable income. Sec. 991. Instead, the DISC's shareholders are taxed each year on a specified portion of its earnings and profits as deemed distributions. Sec. 995. The retained earnings and profits of a DISC that are not taxed currently remain exempt from taxation until actually distributed to the shareholders, as provided in section 996(a)(1), until a shareholder disposes of his DISC stock in a taxable transaction, as provided in section 995(c), or until the corporation ceases to qualify as a DISC, as provided in section 995(b)(2).

For an entity to qualify as a DISC, a variety of requirements under section 992 must be satisfied. See generally *Dresser Industries v. Commissioner*, 92 T.C. 1276, 1280 (1989), affd. in part, revd. in part 911 F.2d 1128 (5th Cir. 1990). An entity which qualifies as a DISC is treated as a separate corporation for Federal tax purposes even though it would not otherwise be treated as a corporation for Federal tax purposes. Sec. 1.992-1(a), Income Tax Regs.

## Intercompany Pricing Rules

Section 994(a) provides three methods of computing the transfer price at which a related supplier is deemed to have sold its products to a DISC, regardless of whether any price is actually paid. Section 994(a) provides:

SEC. 994(a). IN GENERAL.—In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—

(1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts.

(2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or

(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

Petitioner determined its transfer price in accordance with section 994(a)(2), the "50-50 combined taxable income" method. This method permits a DISC to earn 50 percent of the "combined taxable income" of the DISC and its related supplier. Petitioner is the related supplier of International. The DISC is also permitted to earn 10 percent of any export promotion expenses, which are not at issue.

A DISC may operate on a "buy-sell" basis (by taking title to the property to be exported) or on a commission basis (under which it functions as a commission agent for export sales). *Brown-Forman Corp. v. Commissioner,* 94 T.C. 919, 946 (1990). Although the three intercompany pricing methods contained in section 994(a) literally apply only to DISC's operating on a "buy-sell" basis, section 994(b)(1) provides that rules consistent with those set forth in section 994(a) shall be prescribed by regulation for DISC's operating on a commission basis:

SEC. 994(b). RULES FOR COMMISSIONS, RENTALS, AND MARGINAL COSTING.—The Secretary shall prescribe regulations setting forth—

(1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income * * *

International operated on a commission basis with respect to heart valves exported by petitioner.

*Computation of Combined Taxable Income*

The term "combined taxable income," which appears in section 994(a)(2) and (b)(2), is not defined in the Internal Revenue Code. Section 1.994-1(c)(6), Income Tax Regs., defines combined taxable income as:

the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts. * * * In determining the gross receipts of the DISC and the total costs of the DISC and related supplier which relate to such gross receipts, the following rules shall be applied:

\* \* \* \* \* \* \*

(ii) Cost of goods sold shall be determined in accordance with the provisions of sec. 1.61-3. See sections 471 and 472 and the regulations thereunder with respect to inventories. * * *

(iii) Costs (other than costs of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses, and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in section 1.861-8.

Thus, in computing combined taxable income, costs relating to gross receipts are to be determined in a manner consistent with the rules of section 1.861-8, Income Tax Regs. Section 1.994-1(c)(6)(iii), Income Tax Regs., was issued in 1975, 4 years after the enactment of the DISC provisions. 40 Fed. Reg. 29826, 29828-29829 (July 16, 1975). Section 1.994-1(c)(6)(iii), Income Tax Regs., which is applicable only to a buy/sell DISC, is incorporated for purposes of a commission DISC by section 1.994-1(d)(2), Income Tax Regs., which provides:

(2) *Commissions.* If any transaction to which section 994 applies is handled on a commission basis for a related supplier by a DISC and such commissions give rise to qualified export receipts under section 993(a)—

\* \* \* \* \* \* \*

(ii) The maximum commission the DISC may charge the related supplier is the sum of the amount of income determined under subdivision (i) of this subparagraph plus the DISC's total costs for the transaction as determined under paragraph (c)(6) of this section.

In the case of a commission DISC, "gross receipts" equals the gross receipts on the sale, lease, or rental of the property on which the commissions arose. Sec. 993(f).

*Section 1.861-8 Allocation and Apportionment Regulations*

Section 1.861-8, Income Tax Regs., provides rules for determining the taxable income of a taxpayer from specific sources and activities under various sections of the Internal

Revenue Code, referred to in section 1.861-8, Income Tax Regs., as "operative sections." Secs. 1.861-8(a)(1), (f), 1.862-1(b), Income Tax Regs.

Operative sections require a computation of taxable income from a "statutory grouping" and a "residuary grouping." The term "statutory grouping" means the gross income from the specific source or activity which must first be determined in order to arrive at taxable income from such specific source or activity. Gross income from other sources or activities is referred to as the "residuary grouping." Sec. 1.861-8(a)(4), Income Tax Regs. For example, with respect to the computation of taxable income from sources within the United States, the statutory grouping is gross income from sources within the United States, while all remaining gross income composes the residuary grouping. With respect to the computation of combined taxable income under section 994(a), the statutory grouping is gross income from export sales, while the residuary grouping is all remaining gross income.

A taxpayer must allocate deductions to the appropriate class of gross income and then, if necessary to make the determination required by the operative section, must apportion deductions within the class of gross income between the statutory grouping and the residual grouping. Sec. 1.861-8(a)(2), Income Tax Regs. Allocation is accomplished by determining, with respect to each deduction, the class of gross income to which the deduction is "definitely related" and then allocating the deduction to that class of gross income. A deduction is considered "definitely related" to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived. Sec. 1.861-8(b)(2), Income Tax Regs.

However, some deductions are treated as "not definitely related to any gross income," and are ratably apportioned to all gross income. Sec. 1.861-8(b)(1), Income Tax Regs. The deductions which are not definitely related to any gross income are the deduction allowed by section 163 for interest, the deduction allowed by section 164 for real estate taxes on a personal residence or for sales tax on the

purchase of items for personal use, the deduction for medical expenses allowed by section 213, the deduction for charitable contributions allowed by sections 170, 873(b)(2), and 882(c)(1)(B), and the deduction for alimony payments allowed by section 215. Sec. 1.861-8(e)(9), Income Tax Regs.

Where a deduction has been allocated to a class of gross income which is included in both the statutory grouping and the residual grouping, the deduction must be apportioned between the statutory grouping and the residual grouping. If the class of gross income to which a deduction has been allocated is included in its entirety in either a single statutory grouping or the residual grouping, there is no need to apportion that deduction. Sec. 1.861-8(c)(1), Income Tax Regs.

A deduction is apportioned by attributing the deduction between gross income which is in the statutory grouping and gross income which is in the residual grouping. The attribution must be accomplished in a manner which reflects to a "reasonably close extent" the factual relationship between the deduction and the grouping of gross income. Sec. 1.861-8(c)(1), Income Tax Regs.

*Allocation and Apportionment of Research and Development Expenses*

Section 1.861-8(e)(2) through (8), Income Tax Regs., provides special rules for allocation and apportionment of deductions for interest, research and development expenses, and certain other deductions. Section 1.861-8(e)(3), Income Tax Regs., deals specifically with allocation and apportionment of research and development expenses.

Section 1.861-8(e)(3)(i)(A), Income Tax Regs., provides that research and development expenses relating to products within a 2-digit major SIC code category (enumerated by the Executive Office of the President, Office of Management and Budget) are considered deductions which are "definitely related to all income" reasonably connected with the relevant product category and must be allocated to all items of gross income as a class related to the product category.[2]

---

[2]Sec. 1.861-8(e)(3)(i)(B), Income Tax Regs., provides an exception to the general allocation rule of sec. 1.861-8(e)(3)(i)(A), Income Tax Regs., where research and development is undertaken solely to meet legal requirements imposed by a political entity with respect to improvement or marketing specific products, and the results cannot reasonably be expected to

Section 1.861-8(e)(3)(i)(A), Income Tax Regs., lists 89 "SIC major goups," comprised of 32 product categories. A product category may consist of as few as 1 or as many as 15 SIC major groups. The relevant product category (hereinafter referred to as the medical goods category), which is comprised of one SIC major group, number 38, consists of: measuring, analyzing, and controlling instruments; photographic, medical, and optical goods; and watches and clocks. Cardiac pacemakers and insulin pumps, which petitioner attempted to develop, and prosthetic heart valves, which petitioner manufactured and sold, all fall within the medical goods category.

Under section 1.861-8(e)(3), Income Tax Regs., an item of income need not exist for a particular product within a product category as a prerequisite to allocating research expenses to that product. All that is required is that an item of gross income exist as to any product within the same product category. Sec. 1.861-8(e)(3)(ii)(A) and (iii), Income Tax Regs. Thus, the research and development expenses attributable to the insulin pump and cardiac pacemaker ventures must be allocated between the statutory grouping of gross income from export sales and the residuary grouping of all other gross income in computing the combined taxable income of petitioner and International even though the items were never fully developed or marketed.

The final section 1.861-8, Income Tax Regs., which petitioner challenges, was issued in 1977. 42 Fed. Reg. 1195 (Jan. 3, 1977). The section 1.861-8, Income Tax Regs., in effect when Congress enacted the DISC provisions was issued in 1957. 22 Fed. Reg. 8362 (Oct. 23, 1957). None of the regulations under section 1.861-8, Income Tax Regs., final or proposed, which preceded the regulations at issue required that research and development expenses be allocated among SIC product categories.

---

generate amounts of gross income outside a single geographic source. The legal requirement exception is not at issue.

1. *Whether the Research and Development Expense Allocation Moratorium Under Section 223 of ERTA is Applicable to the Computation of Combined Taxable Income*

Petitioner, and Intel Corp. (Intel) in its amicus curiae brief, argues that the research and development expense allocation moratorium provided by section 223 of ERTA permits the exclusion of 100 percent of research and development expenses from the combined taxable income computation.[3] Thus, petitioner and Intel contend none of petitioner's research and development expenses, including those attributable to heart valves, should be allocated to gross income from export sales.

Section 223(a) of ERTA suspended the application of the allocation and apportionment rules under section 1.861-8(e)(3), Income Tax Regs., by requiring, for a 2-year period, that all expenditures for research and development activities conducted in the United States be allocated and apportioned exclusively to sources within the United States:

(a) 2-YEAR SUSPENSION.—In the case of the taxpayer's first 2 taxable years beginning within 2 years after the date of the enactment of the Act, all research and experimental expenditures (within the meaning of section 174 of the Internal Revenue Code of 1954) which are paid or incurred in such year for research activities conducted in the United States shall be allocated or apportioned to sources within the United States.

Section 223(b) of ERTA directs the Treasury to conduct a study with respect to the impact which section 1.861-8, Income Tax Regs., would have on research and experimental activities conducted in the United States, and on the availability of the foreign tax credit:

(b) STUDY.—
(1) IN GENERAL.—The Secretary of the Treasury shall conduct a study with respect to the impact which section 1.861-8 of the Internal Revenue Service Regulations would have (A) on research and experimental activities conducted in the United States and (B) on the availability of the foreign tax credit.

The Treasury study called for by section 223 of ERTA was published in June of 1983. In the study the Secretary

---

[3]In its petition, petitioner alleges that respondent erred by failing to recognize the applicability of sec. 223 of the Economic Recovery Tax Act of 1981 (sec. 223 of ERTA), Pub. L. 97-34, 95 Stat. 172, 249, in computing combined taxable income.

reports that section 223 of ERTA did not reduce research and development allocations to combined taxable income. Department of the Treasury, The Impact of the Section 861-8 Regulation on U.S. Research and Development 17 n.7 (June 1983).

In enacting section 223 of ERTA, Congress focused its concern on the foreign tax credit impact of the geographic allocation of research expenses:

A fundamental principle of the foreign tax credit is that it may not be used to offset the U.S. tax on U.S. source income. The foreign tax credit provisions contain a limitation that insures that the credit will not be used to offset the U.S. tax on U.S. source income. Under the limitation, a U.S. taxpayer is allowed a credit against its U.S. tax for foreign taxes paid on foreign source income only to the extent of the pre-credit U.S. tax on the foreign source income. [H. Rept. 97-201, at 130 (1981).]

And further, under the heading "Treasury regulation sec. 1.861-8":

In determining foreign source taxable income for purposes of computing the foreign tax credit limitation, sections 861-863 require taxpayers to allocate or apportion all of their expenses between foreign source income and U.S. source income. Treasury Regulation section 1.861-8 sets forth the rules on allocating and apportioning these expenses. [H. Rept. 97-201, *supra* at 130.]

The portion of the House report appearing under the heading "Reasons for Change" also focuses on the foreign tax credit limitation:

Taxpayers that allocate research and development expenses for purposes of the foreign tax credit claim that the allocation results in more deductions being allocated overseas than is allowed as a deduction by the foreign country. Thus, taxpayers claim that their foreign tax credit limitation is lower than the foreign taxes paid and that they will lose foreign tax credits.

Taxpayers argue that because of the application of the regulation, they must transfer research and development activities to the foreign country in order to get a deduction in that country and, thus, get a full foreign tax credit on the income earned in that country.

[H. Rept. 97-201, *supra* at 131.]

Respondent contends that section 223 of ERTA is inapplicable to the computation of combined taxable income. In addition to the legislative history of section 223 of ERTA,

which focuses on the foreign tax credit, respondent relies on his analysis in Rev. Rul. 86-144, 1986-2 C.B. 101.

In Rev. Rul. 86-144, respondent reasons that the geographic sourcing of income is not relevant to the computation of combined taxable income:

Section 1.861-8 of the regulations provides rules for the allocation and apportionment of expenses and deductions (e.g., R&D expenses). Under Example 23 of section 1.861-8(g), R&D expenses are allocated and apportioned in two stages. In the first stage, R&D expenses are apportioned in order to calculate CTI for DISC and FSC [foreign sales corporation] purposes by treating the FISC or FSC and its related supplier as a single taxpayer. Section 1.861-8(f)(1)(iii) and Example 23 of Section 1.861-8(g). In the second stage, R&D expenses are apportioned for purposes of calculating the foreign tax credit limitation under section 904. Section 1.861-8(f)(1)(i).

The computation of CTI (first stage) does not involve geographic sourcing of income. It requires apportionment of R&D expenses between the statutory grouping of gross income from exports and other gross income. The sourcing of the income as United States source or foreign source is irrelevant when allocating deductions for purposes of determining CTI. On the other hand, geographic sourcing of income is required for purposes of calculating the foreign tax credit limitation in the second stage of apportionment.

[1986-2 C.B. 101, 102.]

Respondent then discusses the congressional purpose in enacting section 223 of ERTA:

The moratorium under section 223 of ERTA 81 was enacted because of Congressional concern that the allocation and apportionment of R&D expenses under section 1.861-8 of the regulations could cause research activities performed in the United States to be moved abroad. The same concerns that resulted in the ERTA 81 legislation were present when Congress extended the moratorium by enacting section 126 of TRA 84. Prior to the moratorium, a percentage of all R&D expenses was apportioned between the U.S. and foreign source income. Section 1.861-8(e)(3). Expenses apportioned to foreign source income generally reduce the amount of the foreign tax credit by operation of the limitation contained in section 904. In order to encourage domestic research activities, Congress enacted the moratorium requiring the allocation or apportionment of domestic research and experimental expenses against U.S. source income. This allocation method provides a benefit to taxpayers performing research in the United States by increasing the amount of the foreign tax credit limitation. [1986-2 C.B. 101, 102.]

Respondent concludes that section 223 of ERTA is inapplicable to the computation of combined taxable income:

The determination of CTI differs from that of foreign source taxable income. CTI determines the relative amount of income earned by a DISC or FSC and its related supplier from the export of U.S. manufactured goods and, thereby, the tax benefit derived from the export transaction. A taxpayer may derive gross receipts qualifying for DISC or FSC treatment, calculate CTI, and claim the related tax benefits with respect to export transactions irrespective of whether they generate foreign source or domestic source income. Therefore, the sourcing of income is not relevant for purposes of calculating CTI.

The moratorium enacted in section 223 of ERTA 81 and continued in section 126 of TRA 84 revised the allocation and apportionment of R&D expenses for identical reasons i.e., in order to modify the calculation of foreign source taxable income and adjust the foreign tax credit limitation. The moratorium was not intended to modify the amount of DISC or FSC benefits derived from export transactions and, therefore, does not apply to the determination of CTI.

[1986-2 C.B. 101, 102-103.]

A revenue ruling is not binding on this Court, since it only represents the contention of one party to a case. *United States v. Larionoff*, 431 U.S. 864, 873 (1977); *Pacific Gas & Electric Co. v. United States*, 664 F.2d 1133 (9th Cir. 1981). However, we find that respondent's position, as expressed in Rev. Rul. 86-144, *supra*, is correct and in keeping with Congress' purpose in enacting section 223 of ERTA.

Petitioner contends that respondent unreasonably narrows the scope of section 223 of ERTA, citing the conference committee report accompanying ERTA, which in discussing the Senate amendment provides that, during the 2-year moratorium under section 223, research and development expenses attributable to research activities conducted in the United States are to be allocated and apportioned "to U.S. source income for all purposes under the Code." H. Rept. 97-215 (1981), 1981-2 C.B. 481, 496.

We find that the statement which petitioner cites is in keeping with respondent's interpretation of section 223 of ERTA. The moratorium was intended to apply for all purposes for which geographic sourcing is relevant. Because geographic sourcing of income is not an element in the computation of combined taxable income, the moratorium is inapplicable to a DISC.

The moratorium established by section 223 of ERTA was extended for another 2 years by section 126 of the Deficit

Reduction Act of 1984 (sec. 126 of DEFRA), Pub. L. 98-369, 98 Stat. 494, 648. Petitioner argues that the legislative history of section 126 of DEFRA demonstrates Congress' intent to narrow the broad original research and development expense allocation moratorium, which was applicable to the computation of combined taxable income, to one that applied only to the computation of the foreign tax credit limitation. There would have been no need for Congress to amend the moratorium in 1984, petitioner argues, if section 223 of ERTA did not apply to a DISC.

However, section 126 of DEFRA was an extension of section 223 of ERTA, not an amendment. While the DEFRA conference report refers to a "clarification" of the Senate bill's effective date, it does not treat section 126 of DEFRA as other than an extension of the original moratorium. The conference report states:

*The moratorium* [section 223 of ERTA] generally expires for taxable years following a taxpayer's second taxable year commencing after August 13, 1981.

\* . \* \* \* \* \* \*

The Senate amendment effectively extends for two years *the moratorium* on the application of the research and experimental expense allocation rules of Treas. Reg. sec. 1.861-8. \* \* \*

The conference agreement follows the Senate amendment with a clarification of the effective date provision. The conference agreement provides that *the extension of the moratorium* on application of the Treasury's research and experimental expense allocation rule will generally apply to a taxpayer's taxable years beginning after August 13, 1983 and before August 1, 1985. However, in the event the taxpayer's third taxable year commencing after August 13, 1981 does not begin during this period, *the extension of the moratorium* applies to that taxable year also.

The *moratorium* applies only to the allocation of research expenses for the purpose of geographic sourcing of income. *It does not apply for other purposes*, such as the computation of combined taxable income of a DISC (or FSC) and its related supplier.

[H. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 517; emphasis added.]

Significantly, the conference report refers to section 223 of ERTA as "the moratorium," while it refers to section 126 of DEFRA as "the extension of the moratorium." The conference committee's terminology indicates that: (1) It considered section 126 of DEFRA as an extension of section 223 of ERTA, not an amendment, and (2) section 223 of

ERTA (the moratorium) was inapplicable to the computation of combined taxable income because it applied only for purposes of geographic sourcing of income, which is not an element of the computation. The conference report provides substantial support for respondent's analysis.

Section 13211 of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, 100 Stat. 82, 324, extended the moratorium for 1 year. Other than the effective dates of the moratorium, section 13211 made no changes.

Section 1216 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2549, provided that for purposes of sections 861(b), 862(b), and 863(b), 50 percent of all qualified research and experimental expenditures were to be apportioned to income from sources within the United States and deducted from such income in determining the amount of taxable income from sources within the United States, while the remaining portion was to be apportioned on the basis of gross sales or gross income.

The House Ways and Means Committee report discusses its view that the moratorium established by section 223 of ERTA should not be renewed:

> As a matter of tax policy, the committee is of the view that it is appropriate to require the allocation of deductible expenses (including research expenses) between U.S. and foreign source income. * * * Accordingly, the committee has decided not to renew the expired moratorium on the application of the Treas. Reg. sec. 1.861-8 research expense allocation rules.

> *     *     *     *     *     *     *

> While the committee and Congress study these issues further (for a two-year period), the bill provides temporary rules for allocation of research expense that are based on the approach of the Treasury regulation, but that liberalize the Treasury regulation in certain respects. * * * The temporary modifications do not reflect a judgment by the committee that any provision of the existing Treasury research expense allocation rules is necessarily inadequate or inappropriate.[4]

> *     *     *     *     *     *     *

---

[4]See also H. Rept. 99-841 (Conf.) (1986), 1986-3 C.B. (Vol. 4) 1, 608, which states:

The conference agreement does not reflect a judgment by the conferees that any provision of the existing regulation is necessarily correct or incorrect. It is anticipated that the Treasury Department will expeditiously pursue a permanent resolution of the allocation issue. The conferees do, however, consider it important that the Treasury Department reexamine its regulations in light of concerns expressed by the tax-writing committees of both Houses. * * *

The modifications apply only to the allocation of research and experimental expenditures for the purposes of geographic sourcing of income. They do not apply for other purposes, such as the computation of combined taxable income of a FSC (or DISC) and its related supplier.
    [H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 387-388.[5]]

The committee report supports respondent's position that the geographic sourcing of income is irrelevant to the computation of combined taxable income.

Section 4009 of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3653, provided that, for purposes of sections 861(b), 862(b), and 863(b), 64 percent of U.S. research and development expenses must be allocated to U.S. source income and 64 percent of foreign research and development expenses must be allocated to foreign source income. The remainder of U.S. and foreign research and development expenses must be allocated on the basis of gross sales or gross income. The bill was effective with respect to U.S. expenses for taxable years beginning after August 1, 1987, and before January 1, 1991. With respect to foreign expenses, the bill was effective for taxable years beginning after June 21, 1988, and before January 1, 1991.

Section 11401 of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388, 1388-472, extended the application of the statutory allocation rule to apply to the first 2 taxable years beginning after August 1, 1989, and on or before August 1, 1991.

Petitioner has failed to introduce any contemporaneous legislative history indicating that Congress intended section 223 of ERTA to apply to the computation of combined taxable income. In addition, the legislative history of subsequent extensions of the moratorium indicates that section 223 of ERTA was inapplicable to the computation. We therefore reject petitioner's argument that, due to section 223 of ERTA, research and development expenses do not enter into the computation of combined taxable income.

Intel, in its brief filed as amicus curiae, misinterprets respondent's position regarding the effect of not applying

---

[5]The Senate Finance Committee report also states that the modifications provided for in sec. 1303 of its bill apply only for purposes of geographic sourcing, and do not apply to the computation of combined taxable income of an FSC or DISC. S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 703, 706.

section 223 of ERTA in computing combined taxable income. Respondent, Intel argues, is incorrect in his assertion that the amount of petitioner's foreign source income is not affected by the nonapplication of section 223 of ERTA in determining combined taxable income. However, respondent agrees that section 223 of ERTA will ultimately affect the amount of petitioner's foreign source income. Respondent's position is that *combined taxable income* is unaffected by the application of section 223 of ERTA because geographic sourcing is irrelevant to the computation.

Intel argues that respondent's inclusion of research and development expenses in the combined taxable income computation results in the allocation of the expenses to foreign source income in direct contravention of section 223 of ERTA. A DISC is allowed to earn a commission equal to 50 percent of the combined taxable income of the DISC and its related supplier. Sec. 994(a). The shareholder of the DISC is treated as having received a deemed distribution from the DISC equal to at least 50 percent (57.5 percent in the case of a corporate shareholder) of the DISC's taxable income. Secs. 995(b), 291(a)(4).[6] DISC dividends, both deemed and actual, constitute foreign source income to the extent attributable to the DISC's qualified export receipts. Secs. 861(a)(2)(D), 862(a)(2).

The allocation of research and development expenses between gross export sales and other gross income reduces combined taxable income, which in turn reduces the deemed distribution to the shareholder. Because the deemed distribution is classified as foreign source income, the initial inclusion of research and development expenses in the combined taxable income computation ultimately reduces the foreign source income of the shareholder attributable to DISC distributions.

Generally, foreign income taxes paid by a U.S. taxpayer in connection with foreign source income qualify for credit against Federal income tax under section 901. In addition, foreign taxes "deemed paid" qualify for the foreign tax credit under section 902, which applies where dividends are received by a U.S. corporation from a foreign subsidiary. In these situations, allocations of research and development

---

[6]Sec. 291(a)(4) applied to taxable years beginning after Dec. 31, 1982.

expenditures under section 1.861-8, Income Tax Regs., reduce the foreign source income on which the foreign tax was paid and consequently reduce the section 904 limitation fraction.[7]

Intel provides an example of the reduction of foreign source income due to the inclusion of research and development expenses in the combined taxable income computation:

> Shareholder and DISC have $100 of combined taxable income (assuming research and development are not included in the computation) and research and development expenses totalling $20. The amount of shareholder's foreign source income resulting from deemed DISC distributions (assuming there are no additional deemed distributions pursuant to section 995(b)(1)) is:

| | |
|---|---:|
| Combined taxable income | $100.00 |
| | x 50 percent |
| DISC commission | $50.00 |
| | x 57.5 percent |
| Deemed distribution (foreign source income) | $28.75 |

If the $20 of research and development expenses are included in the combined taxable income computation and allocated as provided in section 1.861-8, Income Tax Regs., the amount of shareholder's foreign source income resulting from deemed DISC distributions is:

| | |
|---|---:|
| Combined taxable income | $80 |
| | x 50 percent |
| DISC commission | $40 |
| | x 57.5 percent |
| Deemed distribution (foreign source income) | $23 |

Thus, allocating a portion of research and development expenses to gross income from export sales in the combined taxable income computation reduces the shareholder's foreign source income resulting from deemed DISC distributions, which Intel argues is in direct contravention of section 223 of ERTA.

However, Intel fails to take into account that the portion of the $20 in research and development expense which would otherwise be apportioned against the deemed distri-

---

[7]The sec. 904(a) limitation can be expressed in the following fraction:

$$\frac{\text{foreign source taxable income}}{\text{worldwide taxable income}} \times \text{tentative U.S. tax on worldwide income} = \text{maximum foreign tax credit}$$

bution for foreign tax credit purposes will be apportioned instead to U.S. source income because of section 223 of ERTA. Thus, under its interpretation of section 223 of ERTA, Intel would benefit both from the application of the moratorium to avoid allocating any research and development expenses in the combined taxable income computation, and the application of the moratorium to avoid apportioning research expenses to the deemed distribution, which is classified as foreign source income. Nothing in section 223 of ERTA or its legislative history, or the legislative history of subsequent extensions, supports such an interpretation.

Intel next argues, as does petitioner, that the legislative history of section 223 of ERTA indicates that the section applies for all purposes of the Internal Revenue Code, and specifically for purposes of computing combined taxable income. As we have already rejected this argument, we need not address it again. Finally, we have considered Intel's remaining arguments regarding the legislative history of section 126 of DEFRA and find them repetitive and without merit. We therefore agree with respondent's determination that section 223 of ERTA is inapplicable to the computation of the combined taxable income of a DISC.

Petitioner argues that its failure to allocate research and development expenses attributable to the insulin pump and cardiac pacemaker between gross income from export sales and all other gross income in computing combined taxable income is proper because: (1) Section 1.861-8(e)(3), Income Tax Regs., is inapplicable to the computation of combined taxable income; and (2) to the extent section 1.861-8(e)(3), Income Tax Regs., is applicable to the computation, the regulation is invalid. Petitioner bears the burden of proof with respect to all issues. Rule 142(a).

2. *Applicability of Section 1.861-8(e)(3), Income Tax Regs.*

a. *Whether, pursuant to section 994(a) and (b), only research and development expenses which are "definitely related" to gross receipts from export sales are to be allocated in computing combined taxable income.*

Petitioner contends that only the research and development expenses attributable to heart valves enter into the

combined taxable income computation because the expenses attributable to cardiac pacemakers and insulin pumps, which produced no export sales, are not "definitely related" to gross receipts resulting from export sales. We reject petitioner's argument because the relevant regulations provide otherwise.

A requirement that an expense be "definitely related" to gross income from export receipts in order to be allocated to the item does not exist in the text of sections 994(a) or (b) or 861(b). The term appears in section 1.861-8, Income Tax Regs., and in the regulatory definition of combined taxable income, which provides, under section 1.994-1(c)(6), Income Tax Regs.:

the combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier *which relate to such gross receipts.* * * *

*       *       *       *       *       *       *

(iii) Costs (other than cost of goods sold) which shall be treated as relating to *gross receipts* from sales of export property are (a) the expenses, losses, and other deductions *definitely related*, and therefore allocated and apportioned, *thereto*, and (b) a ratable part of any other expenses, losses, or other deductions which are *not definitely related to a class of gross income*, determined in a manner consistent with the rules set forth in section 1.861-8.

[Emphasis added.]

Both costs that are "definitely related" to gross receipts from the sales of export property and costs that are "not definitely related" to a class of gross income, determined consistently with section 1.861-8, Income Tax Regs., are treated as costs "relating" to gross receipts from sales of export property, and therefore enter into the combined taxable income computation. Pursuant to section 1.861-8(e)(3)(i)(A), Income Tax Regs., research and development expenses are considered "definitely related to all income reasonably connected with the relevant broad product category" of the taxpayer. Therefore, the research and development expenses are treated as relating to gross receipts from sales of export property pursuant to section 1.994-1(c)(6)(iii)(A), Income Tax Regs., and will enter the

combined taxable income computation pursuant to section 1.994-1(c)(6), Income Tax Regs.

    b. *Whether section 1.944-1(c)(6) and (7), Income Tax Regs., which is applicable only to a DISC, supersedes section 1.861-8(e)(3), Income Tax Regs., which applies to a number of Internal Revenue Code provisions, in computing combined taxable income.*

General provisions of law, petitioner argues, must yield to specific ones. *Busic v. United States*, 446 U.S. 398, 406 (1980). Petitioner contends that section 1.994-1(c)(6) and (7), Income Tax Regs. (the grouping provisions), specifically provides that in computing combined taxable income, research and development expenses may be allocated on the basis of industry or trade usage of products or product lines. Section 1.994-1(c)(6)(iv), Income Tax Regs., provides:

(iv) The taxpayer's choice in accordance with subparagraph (7) of this paragraph as to the grouping of transactions shall be controlling, and costs deductible in a taxable year shall be allocated and apportioned to the items or classes of gross income of such taxable year resulting from such grouping.

Section 1.994-1(c)(7), Income Tax Regs., provides:

(7) *Grouping transactions.* (i) Generally, the determinations under this section are to be made on a transaction-by-transaction basis. However, at the annual choice of the taxpayer some or all of these determinations may be made on the basis of groups consisting of products or product lines.

(ii) A determination by a taxpayer as to a product or a product line will be accepted by a district director if such determination conforms to any one of the following standards: (a) a recognized industry or trade usage, or (b) the two-digit major groups (or any inferior classifications or combinations thereof, within a major group) of the Standard Industrial Classification as prepared by the Statistical Policy Division of the Office of Management and Budget, Executive Office of the President.

(iii) A choice by the taxpayer to group transactions for a taxable year on a product or product line basis shall apply to all transactions with respect to that product or product line consummated during the taxable year. However, the choice of a product or product line grouping applies only to transactions covered by the grouping and, as to transactions not encompassed by the grouping, the determinations are made on a transaction-by-transaction basis. For example, the taxpayer may choose a product grouping with respect to one product and use the transaction-by-transaction method for another product within the same taxable year.

The grouping provisions, petitioner argues, supersede section 1.861-8(e)(3), Income Tax Regs., which requires that research and development expenses be allocated on the basis of SIC product categories.

Petitioner misinterprets the purpose and application of the grouping provisions. The grouping provisions do not supersede the section 1.861-8, Income Tax Regs., allocation and apportionment provisions because the provisions are not in conflict. The grouping provisions permit taxpayers to group transactions for purposes of applying the three DISC transfer pricing methods allowed by section 994(a). That is, a taxpayer may use the 4-percent gross receipts method, the 50-50 combined taxable income method, or the section 482 method for different product-line groups during the same year. However, regardless of the product-line groups a taxpayer uses, and whether based on recognized industry trade usage or otherwise, if the taxpayer uses the 50-50 combined taxable income method, research and development expenses are allocable and apportionable, with respect to export receipts attributable to that product-line group, consistent with section 1.861-8, Income Tax Regs. Section 1.861-8, Income Tax Regs., is applied to the products within an SIC code category in the aggregate even though the products may be grouped differently for purposes of applying the transfer pricing methods.

Thus, had petitioner sold insulin pumps and cardiac pacemakers through International in addition to heart valves, pursuant to section 1.994-1(c)(7), Income Tax Regs., it could have used a different method for each product line in computing the commission income of International. However, the use of different product groupings for computing commission income does not affect the applicability of section 1.861-8, Income Tax Regs., where the taxpayer uses the 50-50 combined taxable income method. We therefore reject petitioner's argument that the grouping rules supersede section 1.861-8, Income Tax Regs., in computing combined taxable income.

c. *Whether petitioner's allocation of research and development expenses should be respected because its interpretation of the relevant regulations better matches economic reality than the interpretation advanced by respondent.*

The policy behind section 1.861-8(e)(3), Income Tax Regs., as provided in section 1.861-8(e)(3)(i)(A), Income Tax Regs., is that "research and development is an inherently speculative activity, that findings may contribute unexpected benefits, and that the gross income derived from successful research and development must bear the cost of unsuccessful research and development."

However, petitioner argues, benefits of unsuccessful research into insulin dispensing devices or cardiac pacemakers are unlikely to result in unintended application in developing heart valve technology because they are unrelated and dissimilar products. Both research projects were discontinued, petitioner contends, with no benefit derived for heart valve production.

Respondent replies that it may be impossible to determine whether research and development in one area may benefit product development in another. If the research and development expense allocation regulations provided for narrow product groupings, respondent argues, such expenses might not be properly allocated to the potentially wide category of products which may be developed due to the research efforts.

Petitioner has failed to establish that the relevant regulations do not comport with the "economic reality" on which petitioner relies. In addition, respondent's purpose in promulgating and enforcing the relevant regulations is not to implement "economic reality," but rather to implement the congressional mandate in enacting the corresponding statutory provision. Petitioner has failed to indicate any authority, and we have found none, which would allow a taxpayer to disregard the Commissioner's interpretation of a Treasury regulation on the ground that the taxpayer's interpretation better matches "economic reality." We reject petitioner's argument because it lacks legal authority and is irrelevant to the issues to be decided.

3. *Validity of Section 1.861-8, Income Tax Regs., as Incorporated by Section 1.994-1(c)(6)(iii), Income Tax Regs.*

The starting point in analyzing a regulation's validity is to define the Secretary's source of authority. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982). A regulation may be promulgated under the Secretary's general authority to "prescribe all needful rules and regulations" pursuant to section 7805(a), or it may be promulgated under a specific statutory grant of authority. Greater deference is owed to a regulation issued under a specific grant of authority (legislative regulations) than one issued under the general grant of authority contained in section 7805(a) (interpretative regulations). *United States v. Vogel Fertilizer Co., supra* at 24; *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981).

Petitioner argues that the Secretary's source of authority for promulgating section 1.861-8, Income Tax Regs., is section 7805(a), while respondent argues that, because section 1.994-1(d)(2), Income Tax Regs., which incorporates section 1.994-1(c)(6)(iii), Income Tax Regs., which in turn incorporates section 1.861-8, Income Tax Regs., was promulgated under the specific statutory grant of authority of section 994(b)(1), section 1.861-8, Income Tax Regs., is entitled to a higher degree of deference with respect to the computation of combined taxable income.

In *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979), the Supreme Court discussed the standards for judging the validity of interpretative regulations:

In determining whether a particular regulation carries out the congressional mandate in a proper manner, *we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose.* A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. *Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute.* [Emphasis added.]

If a regulation does not contradict or limit the plain language of the statute it interprets, or if the statutory language is so general as to render an interpretative regulation appropriate, it is valid if consistent with the statute's origin and purpose. *Dresser Industries v. Commissioner*, 92 T.C. at 1292. The statutory language of section 994(a)(2) is extremely general, leaving the computation of "combined taxable income" undefined. In addition, the challenged regulations do not contradict or limit the language of section 994(a)(2) or (b)(1). Therefore, we need only decide whether section 1.861-8(e)(3), Income Tax Regs., as incorporated by section 1.994-1(c)(6)(iii), Income Tax Regs., which is in turn incorporated by section 1.994-1(d)(2), Income Tax Regs., harmonizes with the origin and purpose of section 944(a)(2) and (b)(1). We conclude that it does.

    a. *Whether section 1.861-8(e)(3), Income Tax Regs., as incorporated by section 1.994-1(c)(6), Income Tax Regs., is invalid to the extent it requires allocation of research and development expenses using SIC categories because the categories assume nonexistent factual relationships among products.*

Petitioner argues that the general approach of section 1.861-8, Income Tax Regs., as provided in section 1.861-8(a)(2) and (b), Income Tax Regs., is to allocate deductions to classes of gross income on the basis of factual relationships that exist between a particular deduction and a class of gross income, as intended and expected by Congress in enacting the DISC provisions.

Section 1.861-8(e)(3), Income Tax Regs., petitioner argues, alters this general approach to the allocation of deductions by requiring research and development expenses to be allocated among specified SIC product categories, and by providing that research and development expenses are ordinarily definitely related to all items of income relating to that product category.

The inflexibility of the SIC product categories, argues petitioner, produces anomalous and unexpected results unintended by Congress, such as that of section 1.861-8(g), *Example (4)*, Income Tax Regs., under which a domestic corporation manufactures and sells bulldozers and lawn

mower engines in the United States. It has a wholly owned foreign subsidiary that manufactures and sells lawn mower engines abroad. The domestic corporation is required to allocate the costs of all of its research and development expenses, including its bulldozer research and development expenses, to the SIC product category "machinery, except electrical." As a result, a portion of the bulldozer research and development expenses is apportioned to, and reduces, the domestic corporation's foreign source income despite the fact that neither it nor its subsidiary sells bulldozers abroad.

Petitioner contends that, as in example 4, there is no factual relationship between (1) research and development expenses attributable to cardiac pacemakers and insulin pumps, and (2) research and development expenses attributable to hear valves. Section 1.861-8(e)(3), Income Tax Regs., which requires the allocation of research and development expenses among SIC product categories, petitioner concludes, is unreasonable and inconsistent with the intent and purpose of Congress in enacting the DISC provisions.

Respondent argues that the legislative history of the DISC provisions establishes that Congress intended for combined taxable income to be computed in accordance with section 1.861-8, Income Tax Regs.:

> Under the second pricing rule provided by the bill, a DISC may earn up to 50 percent of the combined taxable income of the DISC and the related person arising from the sale of the property, plus an additional amount equal to 10 percent of the DISC's export promotion expenses attributable to the sale. For this rule, *the combined taxable income from the sale of the export property is to be determined generally in accordance with the principles applicable under section 861 for determining the source (within or without the United States) of the income of a single entity with operations in more than one country.* These rules generally allocate to each item of gross income all expenses directly related thereto, and then apportion other expenses among all items of gross income on a ratable basis. [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 538; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 619; emphasis added.]

While the House and Senate reports do state that combined taxable income is to be determined in accordance with the principles under section 861, the reports were prepared contemporaneously with the enactment of the DISC provisions. When the DISC provisions were enacted during

1971, the section 1.861-8, Income Tax Regs., in effect was the 1957 version, which did not contain the challenged provision.

Not until 1977 were the current regulations issued, for the first time requiring that research and development expenses be allocated in accordance with SIC product categories. Therefore, the reference in the House and Senate reports to the rules under section 861 provides little guidance with regard to the validity of the 1977 version of section 1.861-8(e)(3), Income Tax Regs.

However, section 223 of ERTA provided for a moratorium on the research and development allocation and apportionment regulations, reenactments of the moratorium, and statutory modifications to the regulations. The legislative history of such provisions indicate that Congress has been concerned with and has repeatedly reviewed the research and development expense provisions under section 1.861-8(e)(3), Income Tax Regs., since 1981:

> In the 8 years since the first temporary moratorium on the 1977 regulation was enacted, Congress, the Treasury Department, and representatives of affected industries have intensely scrutinized the effects of the research and experimental allocation rules on research activities. [H. Rept. 101-247, at 1208 (1990).]

Thus, Congress has repeatedly considered the regulations at issue and, unlike its enactment of the moratorium on the application of the regulations for purposes of the foreign tax credit and other provisions which require geographic sourcing of income, has neither modified the allocation and apportionment regulations as applied to the computation of combined taxable income nor expressed its disapproval of the regulations. See discussion regarding the inapplicability of section 223 of ERTA to the computation of combined taxable income, *supra*.

With regard to the requirement under the challenged section 1.861-8(e)(3), Income Tax Regs., that research and development expenses be allocated according to SIC product categories, we note that, in legislative materials relating to section 223 of ERTA, its reenactments, and statutory modifications, Congress did not express disapproval of the

requirement for purposes of either the foreign tax credit or the DISC provisions.[8]

While section 223 of ERTA did provide that 100 percent of research and development expenses performed in the United States were to be allocated to U.S. source income where geographic sourcing was relevant, nothing in the legislative history of the moratorium and its extensions indicates that Congress disapproved of the *method* of allocation under the final section 1.861-8(e)(3), Income Tax Regs. Rather, Congress concluded that, for the period to which the moratorium was applicable, research and development expenses were not to be allocated to foreign source income at all, regardless of the method used.

Congressional review and approval of the challenged regulations is also implicit in congressional action related to the enactment of the intercompany pricing rules for foreign sales corporations (FSC's), which in large part replaced DISC's as part of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494. See *Brown-Forman Corp. v. Commissioner*, 94 T.C. at 946. Under section 925(a)(2) (corresponding to section 994(a)(2)), an FSC may earn taxable income equal to 23 percent of the combined taxable income of the FSC and its related supplier attributable to "foreign trading gross receipts" derived from the sale of export property. Section 925(b) is identical to section 994(b) except for the replacement of the designation "DISC" with "FSC."

The Senate Finance committee explanation states:

> In general, where the provisions of the bill are identical or substantially similar to the DISC provisions under present law, the committee intends that rules comparable to the rules in regulations issued under those provisions will be applied to the FSC. [S. Rept. 98-169 (Vol. I), at 636 (1984).]

Among the relevant factors specified by the Supreme Court, *National Muffler Dealers Association v. United States*, 440 U.S. at 472, in judging the validity of interpretative regulations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of

---

[8]Congress did note that under the 1973 proposed regulations, a greater proportion of research and development expenses were allocable to foreign source income than under the final 1977 regulations at issue.

the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute. In the instant case these considerations indicate that section 1.861-8(e)(3), Income Tax Regs., harmonizes with the origin and purpose of the DISC provisions.

Due to the length of time the final 1977 regulations have been in effect, the close and repeated review of the challenged regulations by Congress and the Treasury, Congress' decision not to suspend the application of the allocation and apportionment provisions with respect to a DISC, and petitioner's failure to produce any legislative history indicating congressional disapproval of the regulations or a lack of harmony with the origin and purpose of the DISC provisions, we reject petitioner's contention that section 1.861-8(e)(3), Income Tax Regs., is an invalid interpretation of congressional intent to the extent it requires allocation of research and development expenses according to SIC product categories in computing the combined taxable income of a DISC and its related supplier.

b. *Whether section 1.861-8(e)(3), Income Tax Regs., as incorporated by section 1.994-1(c)(6), Income Tax Regs., which does not allow an allocation using industry and trade usage product categories, is invalid because the express language of section 994(b) requires the regulations governing allocation of costs of a commission DISC to be consistent with the determination of a transfer price under section 994(a).*

Petitioner argues that the allocation of research and development expenses attributable to cardiac pacemakers and insulin pumps to the gross income from export sales of prosthetic heart valves, as required by section 1.861-8(e)(3), Income Tax Regs., is inconsistent with the express language of section 994(a) and (b) and their legislative history. Section 994(a) and (b), petitioner contends, contemplates computation of combined taxable income on a product-by-product or product line basis, taking into account only the marginal costs of producing the export property.

The express language of section 994(b)(1), petitioner contends, requires the regulations governing the allocation

of research and development expenses to be consistent with the method of determining a transfer price pursuant to section 994(a). Nothing in the legislative history of section 994(a) and (b), petitioner contends, supports the absence in section 1.861-8(e)(3), Income Tax Regs., of an allocation rule permitting the use of a recognized industry or trade usage product category for purposes of allocating research and development expenses to export sales.

In support of its interpretation of section 994(a) and (b), petitioner quotes the House and Senate committee reports:

Where a DISC is attempting to establish a market abroad or seeking to maintain a market abroad, for exports, the Secretary of the Treasury may prescribe by regulations special rules governing the allocation of expenses incurred on the sale of the export property for purposes of determining the combined taxable income of the related person and the DISC. It is expected that in the appropriate cases the regulations will allow, for purposes of applying the pricing rule, the combined taxable income on the sale of export property to reflect a profit equal to that which the DISC and a related party would earn if they took into account only the marginal costs of producing the property. The production expenses not considered marginal costs in this case would, of course, be allocable to the production of the related party which is not sold to the DISC. [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 538.]

The congressional purpose behind the DISC provisions, argues petitioner, was to burden the gross receipts from the sale of export property with the least amount of *marginal* costs possible and thereby maximize the 50-percent portion of combined taxable income deemed attributable to the DISC, thus maximizing the income qualifying for tax deferral. The most straightforward method of accomplishing this objective, petitioner reasons, is to define as narrowly as possible the product group or product line which includes the export sales property. Thus, concludes petitioner, the House and Senate committee reports state that the intercompany pricing rules are to be applied on a "product-by-product" or "product line" basis.

As we have already discussed and rejected petitioner's misinterpretation of the grouping provisions, we need not address petitioner's repetition of this argument. However, we note that the excerpt from the House and Senate committee reports on which petitioner relies addresses the

marginal costing method of computing an intercompany transfer price. The marginal costing method is not at issue.[9]

  c. *Whether section 1.861-8(e)(3), Income Tax Regs., as incorporated by section 1.994-1(c)(6), Income Tax Regs., is invalid to the extent it precludes sales of export property from being treated as part of the wholesale trade category under section 1.861-8(e)(3)(i)(A)(chart), Income Tax Regs., and using the wholesale trade category rules for allocation of research and development expenses.*

Section 1.861-8(e)(3)(i)(A)(chart), Income Tax Regs., includes among the SIC product categories a "wholesale trade" category:

| SIC Major Groups | Nonmanufactured categories |
|---|---|
| * * * * * * * | |
| 50, 51 | Wholesale trade (not applicable with respect to sales by the taxpayer of goods and services from any other of the taxpayer's product categories and *not applicable with respect to a domestic international sales corporation for which taxpayer is a related supplier of goods and services from any other of the taxpayer's product categories*). [Emphasis added.] |

The wholesale trade category is beneficial to taxpayers in allocating research and development expenses between a domestic corporation and its foreign sales subsidiary, as illustrated by section 1.861-8(g), *Example (6)*, Income Tax Regs. In example 6, a domestic corporation manufactures and sells forklift trucks and material-handling equipment in the United States. All of its products fall within SIC product category 37, "Transportation Equipment," to which all research and development expenses are allocable.

The domestic corporation also sells forklift trucks to a foreign sales subsidiary. The subsidiary's sales do not enter into the research and development expense allocation com-

---

[9]Sec. 1.994-2(b)(2)(i), Income Tax Regs., provides the "marginal costing rules" authorized by sec. 994(b)(2). Marginal costing permits an increased allocation of commission or other income to a DISC by allowing combined taxable income to be computed taking into account only the "marginal" costs of producing exported items. The marginal costs taken into account under sec. 1.994-2, Income Tax Regs., generally include only direct production costs, i.e., costs of labor and materials identifiable with particular units of the product or which become an integral part of the specific product.

putations because the regulations treat these sales as falling within SIC product categories 50 and 51, "Wholesale Trade." Further, the domestic corporation's intercompany sales to the subsidiary are treated as sales made within the United States even though title passes abroad.

The result is that the domestic corporation's research and development expenses are not apportionable to the foreign source income from the sales by the subsidiary. Sec. 1.861-8(g), *Example (6)(ii),* Income Tax Regs. The wholesale trade category thus has the effect of increasing the foreign source income from sales through a foreign sales subsidiary, which increases the opportunity for Federal income tax deferral. Section 1.861-8(e)(3)(i)(A)(chart), Income Tax Regs., however, specifically provides that the wholesale trade category is not applicable to a DISC and its related supplier.

Petitioner argues that section 1.861-8(e)(3), (g), Income Tax Regs., which precludes export sales by a DISC from falling within the wholesale trade category, is inconsistent with Congress' purpose in enacting the DISC provisions. The congressional purpose in enacting the DISC provisions, petitioner argues, was to eliminate any unfavorable tax consequences of exporting through a domestic, rather than a foreign, corporation.

Petitioner quotes the testimony of John Connally, Secretary of the Treasury, before the Senate Finance Committee:

The DISC is proposed in the form of a domestic corporation, incorporated under the laws of the United States. As will be explained, the same tax deferral benefit may be obtained in many cases under present law by using a *foreign* subsidiary. If such benefits are to be available, there is no good reason to require that they be obtained by using a *foreign* corporation rather than a domestic corporation, with all the attendant added legal and accounting costs. * * *

* * * * * * *

The DISC proposal is simply an effort to cut through all this maze of complexity and provide, in forthright fashion, the opportunity for tax deferral by use of a *domestic* corporation, rather than a foreign subsidiary. * * *

[Hearings on H.R. 10947 Before the Senate Comm. on Finance (Part I), 92d Cong., 1st Sess. 33-36 (1971); emphasis supplied.]

Petitioner argues that the committee reports emphasize that the principal purpose of the DISC provisions was to grant the same advantageous tax deferral benefits to a DISC

that were available to a foreign sales subsidiary. The portion of the Senate Finance Committee report (which is almost identical to the House committee report) on which petitioner relies states:

> As indicated in the discussion of the reasons for the bill, the committee agrees with the House that it is important to provide tax incentives for U.S. firms to increase their exports. This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are kept abroad.
>
> Both to provide an inducement for increasing exports and as a means of removing discrimination against those who export through U.S. corporations, the House bill and the committee's bill provide a deferral of tax where corporations meeting certain conditions—called Domestic International Sales Corporations—are used.
> [S. Rept. 92-437 (1971), 1972-1 C.B. 559, 609.]

Petitioner is in effect arguing that in enacting the DISC provisions Congress intended to create a domestic tax haven, with the only limitation on income tax deferral being the deemed distribution rules. While the legislative history of the DISC provisions establish that Congress intended to create the same *opportunity* for tax deferral as enjoyed by foreign subsidiary corporations, nothing in the legislative history indicates that Congress intended to duplicate the unlimited tax deferral available to a foreign subsidiary by maintaining its earnings and profits offshore.[10]

Congressional intent in this regard is established by section 994(a) itself, which provides three *limited* methods of computing a transfer price. It would be absurd to argue that, where the section 994(a)(1) method, which allows taxable income equal to 4 percent of qualified export receipts plus 10 percent of export promotion expenses, is

---

[10]In S. Rept. 92-437 (1971), 1972-1 C.B. 559, 609, the Senate Finance Committee states:

The committee agrees with the House that the deferral treatment made available to a DISC should be limited.

applicable, the corresponding regulations must allow the DISC to defer tax in an amount equal to that enjoyed by a foreign subsidiary. It is no more rational to insist that the regulations implementing the combined taxable income method, which is limited to 50 percent of combined taxable income attributable to qualified export receipts plus 10 percent of export promotion expenses, must allow an equivalent deferral.

Congress' intent to place limits on combined taxable income for purposes of section 994(a)(2) is supported by the statement in the Senate report that "Income may not * * * be allocated to the DISC [under the rules of section 994(a)(1) and (2)] * * * to the extent that it would result in the related person who sold the products to the DISC incurring a loss on the sale." S. Rept. 92-437 (1971), 1972-1 C.B. 559, 618. Such a "no loss" rule suggests that Congress intended to prevent unlimited allocation of taxable income to the DISC at the expense of its related supplier. *Brown-Forman Corp. v. Commissioner*, 94 T.C. at 946 n.27.

Petitioner's argument is directed not at the regulations in issue, but at the transfer pricing methods provided by section 994(a), which explicitly provide for a limited deferral of income through the use of a DISC. We therefore reject petitioner's contention that section 1.861-8(e)(3), Income Tax Regs., which precludes export sales of a DISC from coming within the wholesale trade category, is an invalid regulation because such regulation allows a lesser degree of Federal income tax deferral than that enjoyed by a foreign subsidiary.

Petitioner also argues that section 1.861-8(e)(3), Income Tax Regs., is invalid because the explanations provided by the Secretary prior to enactment of the DISC provisions deprived Congress of the opportunity to consider the effect of the wholesale trade category restriction adopted by the Secretary in the regulations.

The Secretary testified at hearings before the Senate Finance Committee that "The DISC proposal is simply an effort to cut through all this maze of complexity and provide, in forthright fashion, the opportunity for tax deferral by use of a *domestic* corporation, rather than a

foreign subsidiary." Hearings on H.R. 10947 (Part I), 92d Cong., 1st Sess. 36 (1971).

It would be a usurpation of the power of Congress, petitioner contends, to allow the Secretary to explain to Congress that the DISC proposal will place a DISC on equal footing with a foreign sales subsidiary, and then to promulgate regulations which deny a DISC, and provide a foreign sales subsidiary with, the opportunity to use the wholesale trade category in determining the extent of its income tax deferral benefits.

However, the Secretary did not explain to Congress that the DISC proposal would place a DISC on "equal footing" with a foreign subsidiary; he merely states that both a DISC and a foreign sales subsidiary present an opportunity to defer taxes. The Secretary's statement is an accurate explanation of the purpose of the DISC provisions, and does not represent a usurpation of the power of Congress. The challenged regulations are in no way inconsistent with the Secretary's statement. We therefore reject petitioner's argument.

    d. *Whether section 1.861-8(e)(3), Income Tax Regs., which precludes the use of the exclusive geographic apportionment method in allocating research and development expenses to combined taxable income, is invalid because the congressional purpose in enacting the DISC provisions was to eliminate any unfavorable tax consequences of exporting through a U.S. corporation, as opposed to a foreign subsidiary.*

Section 1.861-8(e)(3)(ii), Income Tax Regs., provides for the "exclusive geographic apportionment method," under which a fixed percentage of research and development expense is apportioned to the geographic source where research and development activities which account for more than 50 percent of the total expense were performed.

Section 1.861-8(e)(3)(ii), Income Tax Regs., provides, in relevant part:

(ii) *Apportionment of research and development—sales method*—(A) *Exclusive apportionment.* Where an apportionment based upon geographic sources of income of a deduction for research and development is

necessary (after applying the exception in subdivision (i)(B) of this paragraph (e)(3)), an amount equal to—

(1) Fifty percent (50%), in the case of a taxable year beginning during 1977,

(2) Forty percent (40%), in the case of a taxable year beginning during 1978,

(3) Thirty percent (30%), in the case of a taxable year beginning during 1979, and thereafter,

of such deduction for research and development shall be apportioned exclusively to the statutory grouping of gross income or the residual grouping of gross income, as the case may be, arising from the geographic source where the research and development activities which account for more than fifty percent (50%) of the amount of such deduction were performed. * * *

The exclusive geographic apportionment method applies where an apportionment "based upon geographic sources of income of a deduction for research and development is necessary." Examples include the apportionments necessary under sections 863(b), 871(b), 872, 904(d)(2), and 954. The apportionments under these operative sections are necessary to determine taxable income from a particular geographic source to which the operative sections apply.

Petitioner argues that to the extent section 1.861-8(e)(3), Income Tax Regs., prohibits the use of the exclusive geographic apportionment method, such regulation is invalid because it results in a greater Federal income tax deferral opportunity for a foreign subsidiary than for a DISC.

### Example 23

Based on the analysis provided by example 23 of section 1.861-8(g), Income Tax Regs., respondent determined that the exclusive geographic apportionment method is not available to a DISC and its related supplier. Section 1.861-8(g), *Example (23)*, Income Tax Regs., addresses the apportionment of research and development expenses in computing combined taxable income. In example 23, a domestic corporation sells kitchenware and makes all of its export sales through a DISC.

The domestic corporation incurs research and development expenses of $100,000, including $10,000 to meet

product safety standards, and $65,000 otherwise qualifying for the exclusive geographic apportionment method under section 1.861-8(e)(3)(ii), Income Tax Regs. In the example, both the $10,000 amount incurred to meet product safety standards and the $65,000 amount otherwise qualifying for exclusive geographic apportionment are required to be allocated in computing combined taxable income. Example 23 provides:

> For this purpose an exclusive apportionment is not available, since gross income from exports through a DISC and gross income from sales within the United States are both within the same geographic source, United States income * * * On the basis of X's facts and circumstances, $65,000 is apportioned exclusively to sources within the United States, namely gross income from exports through a DISC and gross income from sales within the United States.

Thus, example 23 is based on the premise that gross income from exports through a DISC and gross income from sales within the United States are both within the same geographic source, and therefore geographic sourcing is not an element of the combined taxable income computation. Therefore, the exclusive geographic apportionment method is not applicable to the computation.

In arguing that section 1.861-8(e)(3), Income Tax Regs., is invalid because the regulation does not allow a DISC to use the exclusive geographic apportionment method, petitioner makes the same argument which we have rejected with respect to the wholesale trade category. We will not restate the reasons for our rejection of petitioner's argument, as they are identical.

However, we note that the legislative history of section 223 of ERTA and its subsequent extensions, *supra*, supports respondent's conclusion that geographic sourcing is irrelevant to the computation of combined taxable income. The moratorium and its extensions are made applicable by Congress for purposes of geographic sourcing, but are inapplicable to a DISC. We reject petitioner's argument that, to the extent the regulation at issue precludes a DISC from using the exclusive geographic apportionment method, section 1.861-8(e)(3), Income Tax Regs., is invalid because it

provides for a lesser degree of Federal income tax deferral to a DISC than that enjoyed by a foreign subsidiary.

After concessions,

*Decision will be entered under Rule 155.*